CARLENE K. BROWN, EXECUTRIX OF WILLIAM H. BROWN, DECEASED, DEFENDANT IN ERROR, v. JOHN HONISS AND ANNA P. RANNEY, PLAINTIFFS IN ERROR.

Submitted July 19, 1906—Decided June 17, 1907.

1. Verbal authority is sufficient to authorize an agent to make an agreement in writing binding his principal to convey real estate.
2. It being material to show that a refusal to make conveyance of land pursuant to previous agreement was not due to inability on the part of the vendor to make title, but was a willful refusal, based upon an inadequate reason—*Held,* admissible to show that after demand of a conveyance, and at or before the refusal, the vendor declared that he had received a bond of indemnity to secure him against pecuniary loss occasioned by his refusal.
3. Defendant having pleaded, as an excuse for his breach of an agreement for sale of land, that the purchaser fraudulently procured the agreement by a false representation as to the use to which the property was to be devoted, and there being evidence to show that such a representation was made, but no evidence to

show that it was false when made, or that it was made for a fraudulent purpose—*Held*, immaterial whether the vendor relied upon the representation.

4. A mere declaration of the purpose of the purchaser of land with respect to the use to which the land is to be devoted, where that use is not insisted upon by the vendor at the time as essential, cannot by implication be imported into the terms of a written agreement, so that a change of purpose needs be communicated in order to absolve the purchaser from the imputation of fraud.

5. The rule that a person who makes a false representation in good faith, believing at the time that it is true, is guilty of fraud if on afterwards ascertaining the falsity of the representation he fails to correct the statement, has no application to a mere declaration of intention, made truly and in good faith, followed by a change of purpose with respect to a matter that has not been treated as material in the negotiations.

6. Certain official proceedings of the board of health and common council of a city, eventuating in a resolution by council appropriating a certain sum of money to the holder of the title of certain land for the purpose of purchasing that land, which resolution might, under the evidence, be reasonably found to be an acceptance of an option previously given by the holder of the title to the city—*Held*, evidential of a completed bargain for the sale of the property to the city, and therefore proper to be considered as evidence of the market value of the property.

7. The fact that the evidence did not show that the city's vendor had bound himself in a writing good under the statute of frauds did not deprive the official action of the city of evidential value as between this vendor and a third party who, by breach of an agreement made between him and such vendor, had prevented the latter from completing the sale to the city.

On error to Essex Circuit Court.

For the plaintiffs in error, *Coult, Howell & Ten Eyck*.

For the defendant in error, *Pitney & Hardin*.

The opinion of the court was delivered by

PITNEY, J. This is an action upon contract, brought to recover damages for breach of a written agreement for conveyance of land. The agreement is of the form known as an "option," and is in the following words:

"This is to certify that John Honiss and Anna P. Ranney, owners of the premises hereinafter described, in consideration.

of the payment of twenty-five dollars, do hereby give and grant to William H. Brown, of 78 Fourth avenue, Newark, N. J., agent, the option to purchase the certain tract of land in said city of Newark, bounded by Mt. Prospect avenue, Sylvan avenue, Summer avenue and Second river, for the sum of twelve thousand five hundred dollars, said option to expire on the first day of November next. Any other person applying to purchase said premises during the continuance of said option shall be referred to said William H. Brown, who agrees, on his part, to use his best endeavors to effectuate a sale thereof. And the said parties first above named agree on their part to execute all necessary deed or deeds of conveyance upon a sale negotiated in pursuance of the premises unto said William H. Brown or such party or parties as he shall name.

"Dated Newark, N. J., July 9th, 1901.

"JOHN HONISS,
"ANNA P. RANNEY,
"Per S. H. PENNINGTON, her Att'y."

Before expiration of this option it was extended by an instrument of which the following is a copy:

"This is to certify that the option to purchase land on Sylvan avenue given to William H. Brown by John Honiss and Anna P. Ranney is extended from the first day of November next to the first day of December next, said option having been given by writing dated Newark, N. J., July 9th, 1901.

"Dated Newark, N. J., Sept. 4th, 1901.

"JOHN HONISS,
"ANNA P. RANNEY,
"Per S. H. PENNINGTON, her Att'y."

On October 17th, 1901 (within the time specified by the original option), Brown demanded a conveyance of the land in question, and tendered the purchase-price, $12,500. The conveyance was refused on the ground that he proposed to convey the property to the city of Newark for the purposes

of an isolation hospital. Thereupon this action was brought by William H. Brown in his lifetime. Mrs. Ranney interposed no plea or demurrer, and judgment interlocutory went against her by default. Honiss interposed three pleas, viz., (1) the general issue; (2) that Brown fraudulently procured the agreement of July 9th by falsely representing to Honiss that in case of a sale of the property in accordance with the terms of the agreement the property would be used for factory purposes, while in truth he did not intend to purchase the property for factory purposes, nor intend to devote the same thereto; but, on the contrary, intended to purchase it for the purpose of an isolation hospital for the city of Newark; and (3) that Brown never tendered the purchase-price nor requested a conveyance of the property. Upon these pleas the plaintiff joined issue, and for the purpose of determining the issues thus raised by the defendant Honiss, as well as to assess the damages against both the defendants, the case came on for trial before the Circuit Court.

At the first trial, it having appeared that Honiss was a married man, the trial court, on the authority of *Gerbert* v. *Trustees*, 30 *Vroom* 160, held that he was excused from carrying out his agreement to convey, because of inability to make title due to his wife's inchoate right of dower, and directed a verdict in favor of the plaintiff for the sum of $25, the amount paid by him for the option.

Upon review this court reversed the consequent judgment and awarded a new trial on the ground that the refusal of the defendants to give a deed was not based upon inability to convey, but was a willful refusal for an inadequate reason; that in such circumstances the rule laid down in Gerbert *v.* Trustees had no application, and the plaintiff was entitled to recover for the loss of his bargain. *Brown* v. *Honiss*, 41 *Vroom* 260.

Upon the new trial the jury found a verdict in favor of the plaintiff and assessed the damages at $5,900, and the judgment thereupon entered is now under review at the instance of the defendants.

William H. Brown having died, his executrix was substi-

tuted as plaintiff, and the evidence given by him upon the first trial was introduced at the second trial in accordance with the provisions of the Evidence act. *Pamph. L.* 1900, *p.* 364, § 10.

There are numerous assignments of error based upon exceptions taken to the admission and exclusion of evidence and to the instructions given and refused to be given to the jury. The questions raised, so far as they require present discussion, are as follows:

Objection was made on behalf of the defendant Honiss to the admission in evidence of the agreement of July 9th, 1901, because it was not binding upon Mrs. Ranney. There was, however, clear evidence that Mr. Pennington had been verbally authorized by her not merely to negotiate for her in finding a purchaser but "to give an option for the sale of the property" at a price not less than $12,500. From this the jury might reasonably infer that his authority extended to giving an option in writing such as to bind her. Verbal authority is sufficient to authorize the agent to make an agreement in writing binding the principal to convey real estate. *Browne St. Fr.* (3d ed.), § 370a; 29 *Am. & Eng. Encycl. L.* (2d ed.) 861; *Long* v. *Hartwell,* 5 *Vroom* 116, 121; *Milne* v. *Kleb,* 17 *Stew..Eq.* 378; *Lindley* v. *Keim,* 9 *Dick. Ch. Rep.* 418; *Scull* v. *Brinton,* 10 *Id.* 489; *Tyrrell* v. *O'Connor,* 11 *Id.* 448, 452.

The fact that Mr. Pennington had no authority to sign the deed of conveyance on behalf of Mrs. Ranney is of no consequence since Honiss refused to make such a deed and Pennington likewise refused acting in behalf of Mrs. Ranney. Moreover, Mrs. Ranney, by failing to plead, had, for the purposes of the action, admitted the making and breach of the agreement, and under these circumstances Honiss could not justify his breach on the theory that Mrs. Ranney was not bound.

Objection was made to the admission of the evidence of Brown to the effect that Mr. Pennington (to whom Honiss had referred him as his counsel) said, at or before the refusal to make conveyance, that Honiss had received a bond of in-

demnity to secure him against pecuniary loss in the premises. This evidence, we think, was admissible as tending to show that the refusal of a conveyance was not due to an inability to make title, but was a willful refusal, based upon an inadequate reason.    It appeared upon this trial, as upon the first, that Honiss was a married man, and as his wife had not executed the option, her inchoate right of dower might have been claimed to be an obstacle creating an inability to convey. Under our previous decision (41 *Vroom* 260) it was proper for the plaintiff to show at the present trial that the refusal to convey was for an avowed reason that was inadequate. That the refusal was based, in whole or in part, upon the fact that defendants had received indemnity from a third party was proper to be shown as tending to prove that the refusal was willful.

Error is assigned to the refusal of the trial judge to permit the defendant Honiss to testify why he asked Brown what he was going to do with the property at the time he signed the option of July 9th; and whether in making the option he relied upon the representation or statement made by Brown as to the use of the property; and whether he would have sold the property at that time at that price, or any price, for an isolation hospital.    These questions were based upon the theory that Brown had induced Honiss and Mrs. Ranney to sign the option by making a fraudulent misrepresentation of his purpose with respect to the use to which the property was to be devoted; that the representation was material to the negotiation, so that without it the option agreement would probably not have been made, and that Honiss relied upon the representation in making the agreement.    The only evidence, however, respecting the representation is the following: Brown testified that he did not tell Honiss for what purpose the property was to be used until after the option was agreed upon, and then Honiss asked, in an incidental way, "What do you propose to do with this property?"    Brown replied that he was looking for a manufacturing site, and that the person for whom he was purchasing was abroad.    He testified that his conversation with Honiss at the time he asked for an ex-

tension of the option was to the following effect: Brown told Honiss that the manufacturer for whom he had sought the property did not want it, but that he had another party who he thought would take it if the time were extended one month; that Honiss assented to this, and shortly afterwards brought to Brown the extension agreement, signed, and that at this time Honiss did not ask him what he wanted the property for. Honiss testified that the only conversation between him and Brown before the signing of the option of July 9th, respecting the use to which the property was to be put, was this: "I asked him what he wanted to do with the property. He said he wanted to buy it for a factory site."

This was the state of the evidence at the time the questions were asked of Honiss concerning his reason for inquiring the proposed use of the property, his reliance upon Brown's statement as to that use, and his willingness to sell the property at that time for an isolation hospital.

With respect to Brown's request for an extension of the agreement, Honiss testified that he gave this extension "because he [Brown] said the man was in Europe, and he would not get back in time, and so he wanted another extension; that is what he said."

It will be observed that the representation pleaded and relied upon to excuse the breach of the contract was a representation made by Brown, at or before the signing of the agreement of July 9th, to the effect that Brown desired to purchase the property for manufacturing purposes. Brown testified, in distinct terms, that such was his purpose at the time. There was no evidence to the contrary, the case being devoid of anything to show that Brown, either then or when he secured the extension agreement, entertained a purpose or knew of an opportunity to sell the property to the city for an isolation hospital. Nor is there anything to show that Brown was made aware that it made the least difference to Honiss for what the property was to be used. So far as appears, neither Honiss nor Mrs. Ranney owned any other property in the neighborhood. Their subsequent refusal to convey was avowedly based upon the ground that the proposed establish-

ment of an isolation hospital would injure certain adjoining property that had been conveyed by them some six years before to a Mr. Tiffany, and that Mr. Tiffany had given to the defendants indemnity against their breach of the agreement.

A mere declaration of the purpose of the purchaser with respect to the use to which the property is to be devoted, where that use is not insisted upon by the vendor at the time as essential, cannot by implication be imported into the terms of a written agreement, so that a change of purpose must needs be communicated in order to absolve the vendee from the imputation of fraud. There is no proof here that the original representation was false or fraudulent, nor that it was treated as essential. The clear proof is to the contrary. It was of no consequence, therefore, whether Honiss relied upon the representation and would not have entered into the agreement without it.

Exception was taken to the refusal of the trial judge to charge the jury, as requested, that "if at the time Honiss gave the option Brown represented that the property was to be used for manufacturing purposes, and Brown afterwards changed his purpose and proposed to use it for a materially different purpose, it was his duty to communicate such change to Honiss, and his failure to do so absolved Honiss from all obligation to execute a deed in pursuance of the option." The judge charged the jury that if the representation was honest and was true when made, and was material to the bargain, then the question whether Brown's failure to disclose to the vendors his subsequent change of purpose would avoid the contract depended upon whether it was due to a fraudulent intention to deceive the vendors. This, we think, was sufficiently favorable to the defendants. It will be noted again that the case was devoid of evidence to show that the original representation was false when made, or was in anywise fraudulent, and that there was nothing to charge Brown with notice that the representation was deemed by the vendors as at all material to the bargain. It has been held that a person who makes a false representation in good faith, believ-

ing at the time that it is true, is guilty of fraud if, on after-
wards ascertaining the falsity of the representation, he fails
to correct his statement.   14 *Am. & Eng. Encycl. L.* (*2d ed.*)
102.   But this rule manifestly has no application to a mere
declaration of intention, made truly and in good faith, fol-
lowed by a change of purpose, with respect to a matter that
has not been treated as material in the negotiations.

The remaining questions relate to certain rulings of the
trial judge upon matters of evidence and his instructions to
the jury pertaining to the question of damages.

Objection was made to the introduction in evidence of a
resolution adopted by the common council of the city of New-
ark, September 12th, 1901, and approved by the mayor on
the following day, which reads as follows: *"Resolved,* That
the sum of $17,500 be and the same is hereby appropriated
to William H. Brown for the purpose of purchasing a plot of
land situate between Sylvan avenue and Second river,
bounded on the west by Mt. Prospect avenue and east by
Summer avenue, that amount to be charged to the account
known as 'special real estate and almshouse;' *provided, how-
ever,* that the purchase-money shall not be paid until a deed
conveying the property purchased shall have been delivered
to the auditor, approved by the law department, the land to
be used for isolation hospital purposes."

The objection was that no authority for the passage of such
a resolution had been shown.   Counsel for the plaintiffs in
error argue that the only authority of law is to be found in
*Pamph. L.* 1900, *p.* 321, which act makes it mandatory upon
the town council to appropriate money for the establishment
of a hospital for contagious and infectious diseases wherever
the local board of health declares that the establishment of
such a hospital is necessary, and insist that a proper resolu-
tion of the board of health ought first to have been shown.
Counsel for defendant in error cite, however, the powers
conferred upon local boards of health by the general act of
March 31st, 1887 (*Pamph. L., p.* 80; *Gen. Stat., p.* 1634),
and especially by a supplement of March 29th, 1892 (*Pamph.
L., p.* 353; *Gen. Stat., p.* 1645), by which supplement, when-

over an epidemic of any contagious disease exists or is threatened, or any special need arises for the protection of the public health, and in the judgment of the local board of health the expenditure of a greater sum than that already appropriated to said board for the current year is necessary, the board of health shall so certify to the common council or other governing body, and thereupon such local municipal authorities may provide and pay to such board of health such sum or sums as the board may certify to be necessary. We deem that the evidence in the case raised a presumption that the resolution of September 12th, 1901, was adopted in good faith by the city authorities in the intended exercise of powers conferred upon them by law, hence the admission of the resolution was proper.

Exception was taken to the instruction given by the trial judge to the jury that in ascertaining the market value of the lands in question they might "consider the official action of the board of health and the common council." Also, to his refusal of a request to charge that in arriving at the market value, the amount which the city proposed to pay for the property for the special purpose of an isolation hospital could not be considered, and that the only evidence in the case of market value was the opinion evidence of real estate experts produced by both sides.

The evidence of the official action of the board of health and common council (some of it introduced by the plaintiff and some by the defendants) was as follows:

At a meeting of the board of health, May 17th, 1900, the act of 1900 already alluded to (*Pamph. L., p. 321*) was read, and a resolution was adopted appointing Dr. Herold (president of the board) and two others as a committee to prepare the necessary resolution and lay the matter before the common council. Doctors Disbrow and Becker were appointed to act upon the committee with Dr. Herold.

May 7th, 1901, the board of health adopted a resolution "that the board ask for an appropriation of one hundred thousand dollars for the purpose of buying the necessary land and building thereon an isolation hospital."

At a meeting of June 4th, 1901, the health officer reported that a letter which he had written in response to the motion instructing him to write and request an appropriation of $100,000 from the finance committeee of the common council for the purpose of purchasing land and erecting thereon a contagious disease hospital, was not sent by him, as he had been advised that it would be irregular to do so. The president (Dr. Herold) gave a full statement of the matter, which he said should be left to the special committee, they to go before the finance committee of the common council. It was resolved, "That the committee on contagious disease hospital be given enlarged powers so that they can get an option on property and have power to select a site and have plans prepared for a contagious disease hospital, and that Commissioner Gay be added to the committee. · Moved and seconded that the motion, instructing the secretary to write to the finance committee of the common council and request an appropriation of $100,000 for the ,purpose of erecting a contagious disease hospital, be reconsidered. Carried. On motion the matter was laid on the table."

After the adoption of the resolution extending the powers of the committee of the board of health, Dr. Herold had three interviews with Brown with reference to the property here in question. The first was early in August, when Brown agreed to give him an option upon the property if his prospective purchaser did not want it. The second was about September 1st, when Brown agreed to sell the property to Dr. Herold or to give him an option on it at the price of $17,500. The third interview was on September 12th, being the day on which the common council passed the appropriation resolution. It was at this interview that Herold first disclosed to Brown the purpose for which he desired to buy the property. Until then, Brown supposed Herold wanted it for himself. The committee of the board of health examined the property either in June or July, and then, or later, Dr. Herold was authorized by the committee to get an option upon it at the best price that could be obtained. In August plans were prepared for an isolation hospital adapted to this particular

site. Dr. Herold reported to the committee when he secured the option from Brown, and stated to them that $17,500 was the least price at which it could be purchased.

After the passage of the appropriation resolution by the common council and on September 25th, as appears by the minutes, a special meeting of the board of health was held at the mayor's office by order of the mayor, at which the mayor stated that the meeting had been called to consider and take official action in relation to property recently ordered to be purchased by the common council on behalf of the city for the purpose of isolation hospital. After a full discussion, the meeting adjourned for further consideration of the matter until the next regular meeting of the board.

At a regular meeting, held October 1st, certain citizens entered a protest against the establishment of a contagious disease hospital upon the site in question, and some discussion was had upon the question.

Following the refusal of the defendants to convey the property to Brown pursuant to his demand and tender (the date of which was October 17th), the common council, on November 7th, adopted the following resolution:

"WHEREAS, There was appropriated by the common council on September 12th, 1901, $17,500 for the purchase of lands in the Eighth ward, said lands to be used for isolation hospital purposes; and

"WHEREAS, The party from whom said lands were to be purchased does not hold the title to and is unable to give the city a deed to such property; therefore be it

"*Resolved,* That the resolution, passed by the common council September 12th, 1901, and approved by the mayor September 13th, 1901, appropriating $17,500 to William H. Brown for the purchase of a plot of land situated between Sylvan avenue and Second river, bounded on the west by Mt. Prospect avenue and on the east by Summer avenue, the land to be used for isolation hospital purposes, be and the same is hereby rescinded."

The foregoing is a synopsis of the evidence that was referred to by the learned trial judge when he gave to the jury

the instruction now under criticism—"that in ascertaining the market value of the premises described in the option, the jury may consider the official action of the board. of health and the common council." As will be observed, it tended to show that Dr. Herold, acting for the city, but without disclosing his principal, secured from Brown an option upon the property at the price of $17,500; that on the eve of action by the common council he disclosed to Brown the purpose for which he was buying, and that Brown did not dissent; and that council then adopted the appropriation resolution. The reasonable inference was that this resolution was an acceptance by the city of the option given by Brown to Herold.

We are not called upon to determine whether each and every part of this evidence was proper for submission to the jury upon the question of market value. Much of it was introduced by defendants themselves. And the trial judge was not asked to exclude any particular part from consideration, save the appropriation resolution.

The principal contention of counsel for plaintiffs in error is that this was a mere offer, and therefore not evidential of market value. But, as just shown, there was evidence from which the jury might reasonably find that the appropriation resolution was an acceptance of an option previously given by Brown to Dr. Herold and was therefore the final step in the making of a bargain.

It is also contended that the price of $17,500 was fixed under special and extraordinary circumstances in order that the city might acquire the property for special and urgent uses. But from the evidence the jury might reasonably find that the price was fixed by Brown under ordinary circumstances, without knowledge that the property was desired by the city for a special use. It did not appear, unless by inference, that the city was under any pressure to buy this particular property. There was evidence that a great many other sites were under consideration. The sale to the city at $17,500 was not to be rejected as evidence of market value unless in the event the jury should find that this price was fixed under special and extraordinary circumstances. The

trial judge was not requested to instruct the jury that if they should so find they should reject the evidence of the sale to the city in considering the question of market value. There was a request to the effect that the sale should be disregarded because the city proposed to buy it for a special purpose, but this assumed what was fairly open to dispute, that the circumstances of the sale were so extraordinary that it ought to be rejected as evidence of market value.

Nor is the circumstance that the case is devoid of evidence to show that Brown had bound himself in writing good under the statute of frauds, or to show that the resolution of September 12th was communicated by the city to him, at all controlling. There was a reasonable probability that the bargain would be carried out, even though its terms were not reduced to writing in such a manner as to sustain an action under the statute of frauds. In *Waters* v. *Powers* (1853), 8 *Exch.* 401; 20 *Eng. L. & Eq.* 410, which was an action for breach of contract in not completing certain works, whereby plaintiffs were prevented from fulfilling a contract made by them with another firm consisting of two of the three plaintiffs, it was held that the plaintiffs were entitled to recover as special damage the loss of profit of their contract, although it could not be enforced at law owing to the community of the parties, and was void by the statute of frauds. Baron Alderson said: "The existence of a contract is evidence of the probable amount of loss sustained."

The whole law of future damages (including loss of profits) depends in large degree upon the doctrine of *reasonable probabilities*. The question of the plaintiff's *right* to such damages or profits as against third parties is of consequence only as it bears upon the *reasonable probability* that he has sustained loss through defendant's conduct. Thus, in 13 *Cyc.* 51, it is said: "It must be clearly shown that the profits of which he claims to have been deprived are capable of being definitely ascertained, although it is not necessary that the profits claimed should be certain or probable. It is sufficient if they are reasonably certain or reasonably probable." Our well-known turnip seed case (*Wolcott* v. *Mount*, 7

*Vroom* 262; 9 *Id.* 496) is an illustration. There it was held by the Supreme Court and by this court that where seeds are warranted as to kind, and the vendor knows the use to be made of them, he is answerable for the difference between the value of the product of the seed sold and the value of the product that would have resulted had the seed corresponded to the warranty. In the Supreme Court, Justice Depue (7 *Id.,* at *p.* 269) pointed out that while the earlier English and American cases had excluded, in actions of tort as well as in actions upon contract, the loss of profits from the damages recoverable, this rule had been relaxed in actions of tort (citing *Crater* v. *Binninger,* 4 *Id.* 513), and that in actions upon contract likewise loss of profits, resulting naturally from the breach of the contract, had been allowed to enter into the damages recoverable where the profits are capable of being estimated with a reasonable degree of certainty. In this court, Chief Justice Beasley said (9 *Id.,* at *p.* 500) that "where the situation of the parties is such that, supposing their attention to have been directed to the contingency, they must have perceived, at the time of the making of the contract, that its breach would probably result in the loss of definite profits, such profits being of an ascertainable nature, the compensation which the law affords will embrace these profits." In that case it would have made no difference with the result, we apprehend, had it appeared that the land upon which defendant planted the seed was held by him strictly as a tenant at will and under circumstances that gave him no right to the crop as against the owner of the land, so long as it appeared that there was a reasonable probability that he would not be disturbed in the gathering of the crop. Indeed, in some cases the cause of action itself depends upon the doctrine of reasonable probabilities. Thus, in *Miller* v. *Township of Greenwich,* 33 *Id.* 771, this court held that one having a parol license to maintain a sewer from his land across that of an adjoining owner had an action for damages against a stranger who destroyed or injured the sewer. In such a case the licensor might, of course, terminate the right of the plaintiff at any moment, but the plaintiff is entitled to the

benefit of the reasonable probability that the licensor will not terminate. So, in *Brennan* v. *United Hatters,* 44 *Vroom* 729, Brennan was awarded damages for the wrongful act of the defendants in disturbing his *status* as employe of the Connett hat factory. His employment was treated by this court as an employment at will, for his contract with his employers was subject to a combination agreement between the employing hatters and the union, which we assumed might be unenforceable as contrary to public policy, yet we held that Brennan was entitled to the reasonable probability that his employment would have continued except for the wrongful interference of the defendants. And in commenting upon the English case of Allen *v.* Flood, we said: "We cannot agree that no legal right of Flood and Taylor was interfered with because they had no legal right to insist upon their continued employment with the Glengall Company. They were none the less entitled to the reasonable expectation that their employment would continue, and it did not lie in the mouth of one who, without warrant, had interfered with their *status* as employers to say that if he had not done so their employer might have terminated the *status* of his own accord."

So, in actions for damages under the Death act (*Gen. Stat., p.* 1188), the recovery is based upon and measured by the reasonable expectation of pecuniary benefit that would have come to the next of kin had the person deceased survived. *Consolidated Traction Co.* v. *Hone,* 31 *Vroom* 444, 446; *Cooper* v. *Shore Electric Co.,* 34 *Id.* 558, 567; *Paulmier* v. *Erie Railroad Co.,* 5 *Id.* 151, 156, 158; *Demarest* v. *Little,* 18 *Id.* 28, 30; *May* v. *West Jersey Railroad Co.,* 33 *Id.* 63, 66; *May, Administrator,* v. *West Jersey Railroad Co., Id.* 67; *Graham* v. *Consolidated Traction Co.,* 35 *Id.* 10. A mere right to such pecuniary contribution as against the party deceased is not the sole criterion, unless it appears that there was ability and willingness on his part to fulfill the obligation. Some of the cases just cited illustrate this. See, also, *Cook, Administrator,* v. *American, &c., Gunpowder Co.,* 41 *Id.* 65, 69.

And upon what other fundamental theory is the admission

of evidence of general market value, as bearing upon the measure of damages, to be better justified than because such a general estimate of the value of the thing in controversy shows a reasonable probability that the plaintiff would have been able to dispose of it at such a price?

In our view, therefore, the admissibility of the official proceedings of the board of health and common council upon the question of damages depends not upon the existence of a legal cause of action on Brown's part against the city, but upon the reasonable probability that, irrespective of legal right, the sale to the city would have been consummated but for the conduct of the defendants in breaking their contract.

Nor is the sale which (as the jury had a right to find) Brown had thus made to the city at the price of $17,500 to be excluded from consideration as evidence of market value because of the circumstance that this particular sale was not in the contemplation of the parties when they made their agreement of July 9th. Brown was a real estate dealer, and, according to his evidence, avowedly secured the option from Honiss and Ranney (paying a consideration for it) for the very purpose of making a profit by a resale. Brown testified that he told Honiss that "whoever gets that property from me will pay a great deal more for it." From the terms of the option, this purpose is equally clear. The option was taken by Brown for his own benefit, and it contains a stipulation on the part of the vendors that "any other person applying to purchase said premises during the continuance of said option shall be referred to said William H. Brown, who agrees on his part to use his best endeavors to effect a sale thereof. And the said parties first above named agree on their part to execute all necessary deed or deeds of conveyance upon a sale negotiated in pursuance of the premises unto said William H. Brown, or such party or parties as he shall name." Upon the face of the instrument its only value to Brown was in the profit that he could secure by making a sale to some other party at a price exceeding the price to be paid to Honiss and Ranney.

A resale was therefore in contemplation at the time the

agreement was made. Moreover, the sale that was negotiated by Brown to the city was made known to Mr. Honiss and to Mr. Pennington, who acted as his counsel, as well as the representative of Mrs. Ranney, before demand was made upon them on October 17th for the delivery of a deed, and it was in full view of this very resale, and indeed because of it, that they broke the agreement. Whether the ordinary rule, that the damages allowable for a breach of contract are limited to such as may be fairly said to have been in contemplation at the time the contract was made, applies to a case of the kind now under consideration, where a contract of sale is made for the purpose of enabling the purchaser to make a profit by a resale, and afterwards, when a resale has been secured, the vendor, with full knowledge of the fact, willfully refuses to carry out his agreement—the damage accruing from the loss of such resale being the very damage that is in contemplation at the time of the willful breach of the agreement—is a question not necessary to be determined for the decision of this case, and since it was not argued, we express no opinion upon it.

Aside from the point just suggested, we are content to rest upon the view that the sale of the property to the city at the price of $17,500 was some evidence that such was its general market value at the time of the breach of contract complained of. In this aspect the case is indistinguishable from *Engell* v. *Fitch* (1869), *L. R.,* 4 *Q. B.* 658, which was cited by this court in the former review of this case. *Brown* v. *Honiss,* 41 *Vroom* 260, 264. In Engell v. Fitch, the defendants, who were mortgagees of a house, with a power of sale, sold it by auction to the plaintiff, one of the terms of sale being that possession would be given on completion of the purchase. The plaintiff, being satisfied with the title, called upon the defendants to deliver possession, it appearing that the defendants' mortgagor was in possession, and that he refused to give it up. Defendants were in a position to oust him by ejectment, but refused to do so on the ground of expense. The court held that since the breach of contract arose not from inability of the defendants to make a good title, but

from their willful refusal to take the necessary steps to give plaintiff possession pursuant to their contract, he could recover not only the deposit and the expense of investigating the title, but also damages for the loss of his bargain, and that the profit which it was shown he could have made on a resale was evidential upon the question of market value. It is true that in that case there was no other evidence of market value, while in the case before us there was opinion evidence introduced by both plaintiff and defendants. But that would affect only the weight and not the admissibility of the evidence of a resale.

Some of the members of this court entertain the view that the appropriation resolution of September 12th, by force of its phraseology, evidences not a sale by Brown to the city, nor an agreement by the city to purchase the property from Brown, nor even an offer to Brown of a price for the property, but that it created the *status* of principal and agent between the city and Brown. This view of the matter was not suggested at all in the trial court, and was not raised by counsel for the plaintiffs in error in the printed argument upon which the case is submitted to us. To the point, counsel for defendant in error has neither replied nor had opportunity to reply. If, therefore, we were inclined to accede to the soundness of the view just mentioned, we should not deem it just to base thereon a reversal of the judgment under review without hearing counsel, for, although it is oftentimes proper for an appellate court to affirm a judgment or decree upon a ground not raised in the court below nor in argument here (and this because of the general presumption that the case was rightly decided below), it is not, as we think, proper to reverse a judgment upon a point to which counsel for defendant in error has had no opportunity to address an argument to the court of review.

But, upon consideration, we are satisfied that the suggested construction of the appropriation resolution is untenable. No doubt if Brown had been employed prior to the resolution in the capacity of agent for the city for the purpose of procuring the land, the language of the resolution would be construed

in the light of that fact. But not only did not the fact of such agency conclusively appear (and it·must have conclusively appeared in order to require that the suggested construction of the resolution be adopted), but there is in the record no scintilla of evidence tending to show that Brown was acting or was requested to act as agent for the city or for the board of health in the premises. Such an agency was attempted to be proved by counsel for defendants below, and the attempt resulted in utter failure. Dr. Herold, by whom, it was insinuated, Brown had been employed in behalf of the city or of the board of health, was called as a witness in rebuttal, and positively denied any such agency.

Therefore the appropriation resolution cannot properly be construed as if the appropriation had been in terms to one of the departments of the city, as, for instance, to the "law department" or "the real estate account."

The resolution itself contains not a lisp of agency. On the contrary, it contains clear evidence that Brown was treated as vendor and the city as purchaser. This evidence is (a) that Brown is named in the resolution as recipient of the money appropriated; (b) that the property to be acquired is specifically described, and Brown at the time was in control of the title thereto by virtue of his option with Honiss and Ranney, so that, for the purposes of the bargain between him and the city, Brown was the equitable owner of the lands; (c) the price of the property was fixed in the resolution, which reads not "$17,500, or so much thereof as may be necessary," but simply and precisely, "$17,500;" (d) the clause respecting accounting provides for "that amount (and no less) to be charged to the account," &c., and (e)·the proviso that the "purchase-money" should not be paid until a deed should have been delivered manifestly refers to the same sum of $17,500 as the purchase-price.

It is suggested that by the resolution the "appropriation" is made to Brown unconditionally, while a condition is imposed with respect to the payment of the money, and hence it imports that the payment was to be made to somebody other than Brown, and so leaves Brown in the attitude of an

agent of the city. We see no force in this. The appropriation of public money and its disbursement are two different and separate acts. Webster's definition of "appropriation," so far as here pertinent, is: "The act of setting apart or assigning to a particular use or person in exclusion of all others; application to a special use or purpose, as of money to carry out some object." "Disbursement" is, of course, the same as "payment." In our systems of government, federal and state, the appropriation and the payment of public moneys are always kept distinct, and appropriations are often coupled with some condition whose performance is to come after the appropriation but before the actual payment. By the federal constitution, article I., section 9, "no money shall be drawn from the treasury but in consequence of appropriations made by law." And by the constitution of this state, article IV., paragraph 2, "no money shall be drawn from the treasury but for appropriations made by law." We have a general act upon the subject (*Pamph. L.* 1895, *p.* 788) which declares that "no money shall be drawn from the treasury unless it shall have been explicitly appropriated by the annual appropriation bill to the purpose for which it is drawn." And while this is, of course, repealable, it indicates a legislative policy that has been generally adhered to since its enactment. The same system of requiring an appropriation to precede the disbursement of public moneys is imposed upon our municipalities by section 31 of the Crimes act (*Pamph. L.* 1898, *p.* 803), which enacts that any board of chosen freeholders, common councilmen or the like, or any member thereof, who shall disburse or vote for the disbursement of public moneys in excess of the appropriation and limit of expenditure provided by law, shall be guilty of a misdemeanor.

We have no difficulty, therefore, in finding in the resolution of September 12th clear evidence of an intent on the part of the common council to purchase the land in question of Brown at the price of $17,500. But if there were difficulty in reading this intent in its very letter, the resolution would nevertheless for present purposes be properly construed in the

light of the attendant facts and circumstances, and these leave no doubt of its purpose. As was said by this court in *Shreve* v. *Crosby*, 43 *Vroom* 491, 502, the rule that parol evidence will not be admitted to vary the terms of a written instrument does not apply as between strangers to a contract nor as between a party and a stranger.

It may be noted (although without legal significance) that the common council evidently put upon the resolution of September 12th the same construction that we place upon it; for when they rescinded it, on November 7th, they did so on the ground that "the party from whom said lands were to be purchased [meaning Brown] does not hold the title to and is unable to give the city a deed to such property."

Counsel for the plaintiffs in error further contend that the trial judge erred in allowing the jury, upon finding that the market value of the property, at the time of the breach of contract, exceeded the option-price, to add interest upon that excess from the time of breach until the time of the entry of judgment. In our opinion such allowance of interest was proper.

The judgment under review should be affirmed.

*For affirmance* — THE CHIEF JUSTICE, FORT, PITNEY, TRENCHARD, BOGERT, GREEN, GRAY, DILL, J.J.    8.

*For reversal* — THE CHANCELLOR, GARRISON, HENDRICKSON, SWAYZE, REED, VROOM, J.J.    6.