190 N.J. Super. 197 (1983)
462 A.2d 1273
IN THE MATTER OF ALAN J. KARCHER, INDIVIDUALLY AND AS SPEAKER OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, AND CARMEN A. ORECHIO, INDIVIDUALLY AND AS PRESIDENT OF THE SENATE OF THE STATE OF NEW JERSEY, APPELLANTS,
v.
THOMAS H. KEAN, GOVERNOR OF THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 8, 1983.
Decided May 11, 1983.
*200 Before Judges MATTHEWS, ANTELL and FRANCIS.
Albert Burstein argued the cause for appellants (Rosen, Gelman & Weiss, attorneys; Leon J. Sokol and Michael D. Solomon of the firm of Greenstone & Sokol and Lawrence T. Marinari of the firm of Marinari & Farkas, of counsel; Jill E. Haley, and Leon J. Sokol, Michael D. Solomon and Lawrence T. Marinari, on the briefs).
Michael R. Cole, Assistant Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; William Harla, Deputy Attorney General, on the brief).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
This is an appeal from the action of Thomas H. Kean, Governor of the State, deleting certain appropriations from and reducing other appropriations in Senate Bill 1600 (ultimately L. 1982, c. 49). Appellants claim that this action was in excess of *201 his line-item veto power granted by N.J. Const. (1947), Art. V, § I, par. 15.
Senate Bill 1600 represented the proposed financial plan for the State of New Jersey for the fiscal year 1983. It was adopted by both houses of the State Legislature on June 28, 1982 and was then sent to the Governor to permit him to review and either sign it as passed by the Legislature or return it to the Legislature with deletions made under the power granted to him in the Constitution.
Governor Kean signed Senate Bill 1600 into law on June 30, 1982. He indicated in his message to the Senate that he did so reluctantly, since in his opinion it did not meet the financial needs of the State. He stated that he considered vetoing the entire budget, but "[i]nstead I have employed my line item veto authority to bring the budget into balance and create an adequate surplus." Governor Kean appended a statement of the items in the bill to which he objected, as required by N.J. Const. (1947), Art. V, § I, par. 15. He vetoed certain items which he felt violated the State Constitution by authorizing a Senate subcommittee to share responsibility traditionally assigned to the executive branch. He also vetoed some other expenditures in order to increase the general fund.
Although the Legislature can override the Governor's veto upon a two-thirds vote in both houses, N.J. Const. (1947), Art. V, § I, par. 15, neither house attempted to do so. Instead, appellants filed this appeal on August 13, 1982. Appellants do not challenge all of the reductions made by the Governor, but challenge a number of the changes he made as being in excess of the constitutional authority vested in him.
N.J. Const. (1947), Art. VIII, § II, par. 2[1] establishes the general framework of the form and content of the general *202 appropriations act adopted annually by the Legislature and the Governor, and is, consequently, the source of the general budgetary principles relevant here: (1) the withdrawal of any money from the State Treasury can only be done pursuant to legislative authorization accomplished by statute; (2) the State must annually adopt a single balanced budget covering the whole of the State's fiscal year, and (3) the general appropriations act must be limited to items of appropriation of money and such language conditions, provisos or directives reasonably connected with the disbursement of a particular item of appropriation of money. This third and last requirement stems not only from the provisions of Art. VIII, § II, par. 2, but also from N.J. Const. (1947), Art. IV, § VII, par. 4, which provides in pertinent part:
To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that object shall be expressed in the title.
When the Governor received Senate Bill 1600 as adopted by both houses of the Legislature, since it contained items of appropriation, the provisions of N.J. Const. (1947), Art. V, § I, par. 15,[2] became relevant to his consideration of the bill.
*203 The inclusion of the line-item veto power in the Constitution is in furtherance of several constitutional goals. It permits the Governor to reduce or to delete items of appropriation, thus enabling him to bring authorized expenditures in line with anticipated revenues.
The exercise of the line-item veto power also gives the Governor power to shape governmental policy. Under N.J.S.A. 52:9H-1 and 52:27B-20, the Governor is required annually to "formulate his budget recommendations" and to transmit to the Legislature a budget message which "shall embody the proposed complete financial program of the State Government for the next ensuing fiscal year" and the "purposes to which the recommended appropriations and permissions to spend shall apply...." N.J.S.A. 52:27B-20. The line-item veto power thus gives the Governor an additional and constitutionally sanctioned opportunity to establish governmental priorities by reducing and deleting appropriations he determines do not comport, for budgetary, policy or other reasons, with his view of the direction State government should take.
The line-item power also "eliminates excessive, improper, or unconstitutional appropriations without endangering the safety of appropriations essential to the conduct of state business." Sidney Goldmann and Bertram C. Bland, "The Governor's Veto Power" (Monograph), 2 Proceedings of the 1947 Constitutional Convention 1418, 1428.
In his veto statement appended to Senate Bill 1600, Governor Kean summarized his reasons for reducing and deleting some items of appropriation:
My veto recommendations are predicated on two issues. First, a budget totalling $6.2 billion must have an adequate surplus. Second I feel it is inappropriate for the Legislature to increase the spending levels I initially *204 recommended, and to fund new programs, in a budget that doesn't provide adequately for essential State services.
With respect to his deletions of language in the bill, he said:
In addition to various specific dollar appropriations in the budget, the Legislature has inserted certain language and provisions into Senate Bill No. 1600 to direct the manner in which the Chief Executive is to execute some of his responsibilities. Some of these legislatively imposed provisos and conditions are integrally and permissibly tied to specific items of appropriation. Other provisions, however, place broad restrictions on the way in which the Executive Branch administers particular areas of the State government on a day-to-day basis and, in some cases, authorize a Legislative Subcommittee to share responsibility with the Executive in matters traditionally and inherently assigned to the Executive Branch.

I
All of the issues in this appeal involve claims that the Governor exceeded his power to veto individual "items of appropriation of money" while giving his approval to the general appropriations bill.
The Governor's power to veto individual items contained in bills while approving the remainder of the bill applies solely to "items of appropriation of money." The provision dealing with his general power of approval over bills, N.J. Const. (1947), Art. V, § I, par. 14(b),[3] speaks in terms of an entire bill. Art. V, § I, par. 15 is therefore an exception to the general rule that the Governor must approve or veto a bill in its entirety.
An item may at times be included in an appropriations bill which actually is not an item of appropriation of money. In such a case, it appears to be a reasonable inference supported by cases in states having constitutional provisions similar to N.J. *205 Const. (1947), Art. V, § I, par. 15, that the Governor cannot veto such an item, even if it is unconstitutional. The protection against this type of abuse is found in the single-item clause, N.J. Const. (1947), Art. IV, § VII, par. 4, rather than in a line-item veto of an item of appropriation.
The "state Constitution is not a grant but a limitation of power [,]" Gangemi v. Berry, 25 N.J. 1, 7 (1957). The State Legislature is the repository for the reserved powers of the people, and the Governor's veto is a limitation on that power. General Assembly of State of New Jersey v. Byrne, 90 N.J. 376, 384 (1982); the Legislature is free to act except as limited by the State Constitution, Smith v. Penta, 81 N.J. 65, 74 (1979). Thus, the veto power should be interpreted to limit the power of the Legislature only to the extent that such power is explicitly granted to the Governor.
The veto power has been described as "a qualified and destructive legislative power...." Welden v. Ray, 229 N.W.2d 706, 711 (Iowa Sup.Ct. 1975), citing State ex rel. Teachers and Officers of Industrial Institute and College v. Holder, 76 Miss. 158, 23 So. 643, 645 (Miss.Sup.Ct. 1898); see, also, Brown v. Firestone, 382 So.2d 654, 664 (Fla.Sup.Ct. 1980); Cenarrusa v. Andrus, 99 Idaho 404, 582 P.2d 1082, 1091-1092 (Sup.Ct. 1978). To the extent that this power is legislative, N.J. Const. (1947), Art. III, par. I applies:
The powers of government shall be divided among three distinct branches, the legislative, executive and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
Accordingly, the veto power should be construed narrowly with the result that the exercise of the line-item veto must be strictly limited to "items of appropriation of money." An implied extension of the item veto to allow the Governor to eliminate items which are not items of appropriation of money simply because they happened to appear in an appropriations bill, is totally inconsistent with the view that his powers over the Legislature are limited to those expressly granted.
*206 Thus, it becomes necessary to determine what are items of appropriation of money to which the partial veto does extend. In Brown v. Honiss, 74 N.J.L. 501, 521 (E. & A. 1906), the following definition was given:
Webster's definition of "appropriation," so far as here pertinent, is: "The act of setting apart or assigning to a particular use or person in exclusion of all others; application to a special use or purpose, as of money to carry out some object."
The meaning of "items of appropriation of money" was also described in State ex rel. Stephan v. Carlin, 230 Kan. 252, 631 P.2d 668, 672 (Sup.Ct. 1981), as items which involve "the designation of specific sums of money which the Legislature authorizes may be spent for specific purposes." Id. An item is not an item of appropriation of money unless it authorizes the spending or disbursement from the treasury of money for a specific purpose. Id.
The approach which the Idaho Supreme Court took to determine which items are subject to a partial veto for appropriations bills in Cenarrusa v. Andrus, 582 P.2d at 1090, limits the application of the partial veto to items of appropriation even though the Idaho constitution provides that the governor has a line-item veto over "any item or items of any bill making appropriations of money embracing distinct items." Id. at 1088. Although the language of the provision appears to relate to any items contained in appropriations bills, the Idaho court limited its operation to items of appropriation of money. Id. at 1090. The court said this meant that only items which actually dedicated sums of money to a specific purpose were subject to the veto. Id. at 1090-1091. Therefore, an item of legislation might appear in an appropriations bill but not be subject to the partial veto.
In Jessen Associates, Inc. v. Bullock, 531 S.W.2d 593 (Tex.Sup. Ct. 1976), a case in which the governor's veto was improperly used to delete items which were not "items of appropriation of money" from a bill, the sole source of the governor's partial veto power was contained in a provision similar to ours: "If any bill presented to the Governor contains several items of appropriation he may object to one or more of such items ..." Id. at 598. *207 The Texas court held that the item vetoed must be an item of appropriation of money; the veto would have no effect if the item "is merely language qualifying an appropriation, or directing its uses." Id. See also Opinion of the Justices, 306 A.2d 720, 723 (Del.Sup.Ct. 1973) [Veto power providing that "(t)he Governor shall have power to disapprove of any item or items of any bill making appropriations of money ..." was held to create a partial veto of items actually appropriating money, which did not extend to items imposing conditions thereon]; Patterson v. Dempsey, 152 Conn. 431, 207 A.2d 739, 746 (Sup.Ct.Err. 1965) [power to veto extends only to the "item or items of appropriation," even though approval of the bill as an entirety may involve some sections which are not items of appropriation]; Brown v. Firestone, 382 So.2d at 668 [the governor may "either veto an entire bill, or in the case of a general appropriations bill, he may veto any specific appropriation"]; State ex rel. Stephan v. Carlin, 230 Kan. 252, 631 P.2d 668, 672 (1981).
The Governor argues, assuming arguendo the correctness of appellants' position that a governor may not use his line-item veto power to strike a language qualification or condition attached to an appropriation without vetoing the appropriation, that principle, nonetheless, must be modified by the rule that the Legislature may not, under the guise of imposing a qualification upon an appropriation, violate other constitutional principles (e.g. separation of powers). Brown v. Wright, 231 Ga. 686, 203 S.E.2d 487, 491 (Sup.Ct. 1974); State ex rel. Meyer v. State Bd. of Equal. & Assess., 185 Neb. 490, 176 N.W.2d 920, 926 (Sup.Ct. 1970); Welden v. Ray, 229 N.W.2d at 710. See Smith v. Penta, 81 N.J. 65, 74 (1979) (the Legislature is free to act except as limited by the State Constitution). Thus, the Governor contends, the Legislature "cannot do indirectly through the means of line-item appropriations and conditions what is impermissible for it to do directly." Bd. of Regents of Higher Education v. Judge, 168 Mont. 433, 543 P.2d 1323, 1333 (Sup.Ct. 1975).
*208 When he signed Senate Bill 1600 into law, the Governor objected to the inclusion in the act of language which he found to violate several constitutional principles, including the doctrine of separation of powers, the doctrine of bicameralism, the single-object clause and the prohibition against amending permanent law by reference only to its title. Invoking "his own constitutional duty not to enforce unconstitutional enactments," the Governor expressed his intention not to honor the constitutionally objectionable language provisions by identifying such language in his veto statement and deleting it.

II
Appellants challenge the deletion of §§ 35 and 36 on page 173 of Senate Bill 1600, and the deletion of § 47 on page 175 of that bill.[4]
*210 The Governor wrote in his statement of items that §§ 34 through 41 sought "to involve members of the Legislature, in particular the Subcommittee on Personnel of the Joint Appropriations Committee, in decisions concerning the employment and compensation of individual State Employees." He objected to Section 47 on the basis that it created an "unworkable rule" by requiring that all unclassified employees making salaries over $15,000 be eliminated before allowing the number of classified employees to be reduced. He believed that:
These sections severely impair needed administrative flexibility and infringe upon the prerogative of the executive branch, in violation of the principle of separation of powers expressed in Article III of the State Constitution, to make the specific management entailed in the execution of the laws. A serious constitutional infirmity is also presented by the attempt to delegate asserted legislative authority to a subcommittee without concurrence of the full legislative body.
The language paragraphs in Senate Bill 1600 with which we are concerned here would have infringed unconstitutionally upon the Governor's day-to-day administration of government. The excessive intrusions permitted by some of the deleted paragraphs impede the Governor's duty to execute the law, and result in an impermissible arrogation of power to the Legislature.
The provisions of the appropriations act rejected by the Governor requiring prior approval of Executive Branch actions by a legislative subcommittee violate the doctrine of bicameralism as well as the doctrine of separation of powers. Bicameralism is a restraint on legislative power embodied in the State Constitution vesting the legislative power in a two-house legislative body and requiring that all bills must be adopted by a majority of each house. N.J. Const. (1947), Art. IV, § I, par. 1; Art. IV, § IV, par. 6. These constitutional provisions are impugned by the language in the appropriations act creating the Subcommittee on Personnel since that group has been granted a power that can only be exercised, if at all, by the Legislature.
*211 In Springer v. Philippine Islands, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), the court invalidated a statute vesting the voting power of government-owned bank stock in a committee composed of the governor, the senate president and the house speaker:
Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. It is unnecessary to enlarge further upon the general subject, since it has so recently received the full consideration of this court. Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 ...
Not having the power of appointment, unless expressly granted or incidental to its powers, the Legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might be different if the additional duties were devolved upon an appointee of the executive. [277 U.S. at 202, 48 S.Ct. at 482]
Accord: People v. Tremaine, 252 N.Y. 27, 168 N.E. 817 (Ct.App. 1929) (The Legislature could not confer on its own fiscal committee the power to administer already appropriated funds; such action is an unlawful usurpation of executive power by the legislative branch); In re Opinion of the Justices to the Governor, 369 Mass. 990, 341 N.E.2d 254 (Sup.Jud.Ct. 1976) (Statute requiring prior approval by joint legislative committee before vacancies in executive departments could be filled held in violation of separation of powers).
We cannot conclude that Governor Kean acted correctly in deleting by line-item veto from Senate Bill 1600 language he believed to be unconstitutional. Nor do we agree that a similar procedure was sanctioned by the Supreme Court in N.J. General Assembly v. Byrne, 90 N.J. 376 (1982). In that case Governor Byrne directed his cabinet officers to disregard the provisions of "The Legislative Oversight Act," L. 1981, c. 27, as unconstitutional even though his veto of that act had been overridden by the Legislature.
The Governor claims that the propriety of the procedure followed by him in this case is even more evident when viewed in the context of the appropriations process. The Constitution requires that State government be financed through a balanced *212 appropriations act covering the entire fiscal year. N.J. Const. (1947), Art. VIII, § II, par. 2. He argues that the line-item veto power is constitutional recognition of the need to have a balanced budget in place at the start of a fiscal year. Rather than employ his absolute or conditional veto, he contends the Governor may delete items selectively while avoiding a confrontation with the Legislature, and the danger of the fiscal year starting without a lawful budget in place. He argues that without the availability of the procedure employed here, he would be put to a Hobson's choice of either vetoing the appropriations bill in its entirety and suffering the fiscal crisis which would necessarily ensue, or accepting unconstitutional intrusions on his authority contained therein.
Appellants cannot rely on the principle that the line-item veto clause refers only to items of appropriation to protect unconstitutionally included items. The language granting that power to the Governor was clearly premised on the expectation that only items of appropriation of money, or reasonable conditions on their expenditure, would be included in a general appropriations act. The inclusion of provisions offensive to other constitutional principles in the appropriations act constitutes an unconstitutional challenge to the Governor's line-item veto power and the balance it was designed to achieve. The Governor's attempted veto, although ineffective, was understandable in the circumstances. His act called the attention of the public to the fact that the Legislature had exceeded its powers in acting as it did.[5]
The Legislature cannot be heard to complain of this action. None of its rights or powers has been invaded. The reverse is true. The Legislature has no power to pass laws violative of constitutional mandates, nor to insist that same be employed.
In implementing the system of checks and balances created therein, our Constitution vests the executive power in the Governor, *213 N.J. Const. (1947), Art. V, § I, par. 1, and confers on him the duty to "take care that the laws shall be faithfully executed." N.J. Const. (1947), Art. V, § I, par. 11. He is thus allocated the constitutional responsibility of directing the State Government on a day-to-day basis, which includes supervisory power over the principal executive departments and subordinate administrative agencies that aid him in fulfilling his constitutionally assigned task. N.J. Const. (1947), Art. V, § IV, pars. 1, 2, 4 and 5.
One aspect of the Governor's duty to execute faithfully the law is his responsibility to implement the appropriations act once it becomes law. The appropriations process is, of course, conceptually different from the disbursement of appropriations. Brown v. Honiss, 74 N.J.L. at 521. The disbursement of appropriations is a function of the Executive Branch. Department of Administration v. Horne, 269 So.2d 659, 660 (Fla.Sup.Ct. 1972). See Opinion of the Justices to the Senate, 375 Mass. 827, 376 N.E.2d 1217, 1222 (Sup.Jud.Ct. 1978) (The activity of spending appropriations is essentially an administrative task and the governor must be allowed discretion to perform it). As noted in State ex rel. Meyer v. State Bd. of Equal. & Assess., 176 N.W.2d, at 926, the Legislature
cannot through the power of appropriation exercise or invade the constitutional rights and powers of the executive branch of the government. It cannot administer the appropriation once it has been made. When the appropriation is made, its work is complete and the executive authority takes over to administer the appropriation to accomplish its purpose, subject to the limitations imposed.
The scope of the Legislature's power to engage in "over-sight" of Executive Branch actions employing methods similar to those utilized here to review the Governor's administration of the appropriations act was recently discussed in General Assembly v. Byrne, 90 N.J. 376. There the court considered the validity of a statute that would have allowed the Legislature to veto by a concurrent resolution of both houses every administrative regulation proposed by a state agency, with some exceptions. L. 1981, c. 27. The court found that the statute violated the doctrine of separation of powers and the Presentment Clause *214 because it permitted the Legislature not only to make the law but to enforce it as well. 90 N.J. at 378-379. The court held that legislative action which interferes excessively with the Governor's ability to execute the law contravenes the doctrine of separation of powers. 90 N.J. at 384, 385, 388 and 396. It found such unconstitutional interference in the Legislature's attempt to arrogate unto itself power to nullify at will executive actions (rulemaking), without following the constitutionally prescribed method for the enactment of law. The Court found that having delegated rulemaking power to the Executive, the Legislature could not intrude on the exercise of that authority and oversee its implementation by unilateral action. 90 N.J. at 388.
So here, it is not for the Legislature to dictate how the Governor should carry out his constitutional responsibility to execute the provisions of the appropriations act. As Justice Schreiber, dissenting and concurring, wrote in Enourato v. N.J. Building Auth., 90 N.J. 396 (1982):
More importantly whether the Legislature exercises the discretion to finance or not to finance governmental operations cannot justify a legislative intrusion into the executive power. Stating the proposition demonstrates its inherent weakness. Legislative control over appropriation purse strings does not warrant violation of the constitutional separation of powers. Otherwise, the Legislature could through this mechanism direct the operations of all executive functions. [90 N.J. at 415]
While we are constrained to conclude that the exercise of the line-item veto of the paragraphs in question by the Governor was unconstitutional, it is our conclusion that these paragraphs themselves are unconstitutional and therefore void.

III
Appellants next challenge the deletion of lines 56-65 and lines 65A to 65F on page 143.[6] Lines 56-65 of Senate Bill 1600 dealt *215 with distribution of franchise and gross receipt taxes imposed by N.J.S.A. 54:30A-54(a), (b) and (c).
N.J.S.A. 54:30A-49 et seq. creates a tax imposed principally upon gas, electric and water public utilities for the privilege of exercising a franchise and using or occupying public places (e.g. streets). The legislative scheme is comprised of three main tax impositions pursuant to N.J.S.A. 54:30A-54(a), (b) and (c). N.J.S.A. 54:30A-54(a) generally imposes a tax at a rate of 5% on a portion of the utilities' gross receipts; this tax is commonly referred to as the "public utilities franchise tax." N.J.S.A. 54:30A-54(b) generally imposes a tax of 7 1/2% on gross receipts generated from the sources listed in the statute; this tax is often denominated the "public utilities gross receipts tax." The third component, N.J.S.A. 54:30A-54(c)(1) and (2) imposes additional taxes generally calculated in the same manner as in N.J.S.A. 54:30A-54(a) and (b). The revenues generated under N.J.S.A. 54:30A-54(a), (b) and (c) are collected by the State and paid into the general fund.
The proceeds from the taxes imposed by N.J.S.A. 54:30A-54(a) and (b), after a deduction of the expenses of State administration, historically have been apportioned for collection by and payment to the various municipalities in which the taxpayer utilities operate, in the same proportion that the value of the scheduled property (see N.J.S.A. 54:30A-50(d) and 54:30A-58), *216 of the public utility located within the municipality bears to the total value of scheduled property of the utility located throughout the State. The apportionment formulae are now expressed in N.J.S.A. 54:30A-60 and 61.
In 1980 the Legislature passed three bills reforming the distribution of gross receipts tax revenues, L. 1980, c. 10 (Senate 793); L. 1980, c. 11 (Senate 794); L. 1980, c. 12 (Senate 795), intended to provide "a modest reallocation of some of the revenue growth in these taxes from communities with low tax needs to communities with substantial ones." Statement to Senate 795 (1980). L. 1980, c. 11, § 4, now codified at N.J.S.A. 54:30A-61.1, placed a cap on the amount of utility gross receipts taxes distributed pursuant to N.J.S.A. 54:30A-60 and 61.
In addition, L. 1980, c. 11, § 3, now codified at N.J.S.A. 54:30A-62, converted the franchise tax from a tax apportioned at the state level for local collection into a tax to be paid directly to the State. As reflected in the sponsor's statement to Senate 794:
The bill further provides for State collection and distribution of the gross receipts tax revenues. Each utility company currently pays every municipality separately.[7]
The result of the change in the law is that gross receipts tax revenues will in the future be paid into the State's general fund as general State revenue, making such revenues available for allocation by the annual appropriations act. Consequently, an *217 appropriation (in the form of appropriated revenue) of the proceeds from the franchise tax on public utilities as State aid to municipalities covered by N.J.S.A. 54:30A-60 and 61 appeared for the first time in a state budget in the 1981 Appropriations Act (for the fiscal year commencing July 1, 1980). L. 1980, c. 56. Compare: 1981 Appropriations Handbook 439 with the 1980 Appropriations Handbook, State Aid section, Department of the Treasury.[8]
Senate 1600, as enacted, provided that, assuming the application of the formulae for appropriation in 1982, no local government would receive more than 92.221235% of the difference between what was paid in 1981 and the amount to be apportioned in 1982. The remaining 7.778765% was then specifically designated as general revenue anticipated by the State. This was a deviation from the plan envisioned by N.J.S.A. 54:30A-24.1 and N.J.S.A. 54:30A-61.1, both of which direct that money left over after apportionment to municipalities be deposited in a Municipal Purposes Tax Assistance Fund.
Lines 65A-65F also limited the amount to be paid from this tax to municipalities to $140,000,000, any excess to be used for general State purposes.
Governor Kean used the line-item veto to reduce the percentage of the difference between the amount paid in 1981 and the amount to be apportioned in 1982 from 92.221235% to 67.811935%. He also reduced the maximum amount which could *218 be paid to municipalities from this source from $140 million to $125 million.
Since the revenue remaining from the tax after payment of the percentage appropriated was to be paid to the State's general fund, appellants claim the Governor accomplished the diversion of funds which would have gone to municipalities under the original apportionment. Any money saved by the reduction of maximum payment from $140 million to $125 million would also go into the general fund.
Appellants argue that this section of Senate 1600, which recognizes the apportionment formulae of N.J.S.A. 54:30A-24.1 and N.J.S.A. 54:30A-61.1 and limits the amount to be received by municipalities thereunder, is not an item of appropriation. They base their assertion on the theory that proceeds of the utilities gross receipts and franchise taxes are not state funds at all, because they are to be sent directly to the municipalities, and therefore their apportionment does not require an appropriation of funds. Since the item veto power was created to deal with the problem of appropriations of state money alone, its use to nullify an item which appeared in an appropriations bill but which in actuality merely took away money belonging to municipalities was improper. We disagree; the tax revenues are clearly state funds.
Appellants also argue that this use of the item veto violates the separation of powers in that the Governor is, in effect, using it to transfer previously designated funds from the municipalities to whom they are due, to the general fund, where they may be used for other purposes. They argue that the Governor acted legislatively, since he altered the use to which the money was intended to be put, i.e., he not only struck the line-item but made the funds available for other purposes.
All of appellants' contentions with respect to the Governor's reduction of the state aid appropriation to municipalities have been fully discussed and rejected in Camden v. Byrne, 82 N.J. 133 (1980). That case is both factually and legally apposite here.
*219 In Camden v. Byrne the court considered consolidated appeals from several municipalities and counties challenging the failure of the Legislature and the Governor to provide in the general appropriations act State revenues under particular permanent statutes allocating funds for various local government purposes. Three statutes were involved: the sales and use tax (since repealed), the bus franchise replacement tax and the transfer inheritance tax. Each statutory enactment imposed a tax and provided for the disbursement and distribution of some or all of its tax revenues to local government bodies as State aid.
The court reviewed the constitutional requirement of a "unitary appropriation law covering but a single fiscal year," 82 N.J. at 146, and concluded that the separate statutes providing for the distribution of the sales and use tax, the bus franchise replacement tax and the transfer inheritance tax
do not constitute legislative appropriations in and of themselves. Additionally, these separate enactments have not been aggregated or included within a single appropriation law encompassing one fiscal year. They cannot serve, therefore, as valid authority for the withdrawal of monies from the State treasury under the State Constitution. [82 N.J. at 146]
Accordingly, the court further said the various taxing statutes are not "self-executing as current appropriations(,)" 82 N.J. at 147; and "cannot have the legal effect of appropriation laws(.)" Id. at 150. The court also observed that
even though certain of these statutes purport to `dedicate' state revenues for a particular purpose, the Legislature has the inherent power to disregard prior fiscal enactments. Statutes similar in nature and purpose to those involved in these appeals have been held to require subsequent legislative appropriations to be effective authorizations of the expenditure of public monies. [82 N.J. at 147]
The court thus held that in order to fulfill the promise of State aid contained in the several separate statutes, a valid legislative appropriation (which includes a requirement of gubernatorial approval or legislative action over his veto) providing funding would be required.
In this case the statutory scheme in question imposes a franchise tax on public utilities measured by their gross receipts. N.J.S.A. 54:30A-16 et seq. and 54:30A-49 et seq. Like the three tax statutes considered in Camden v. Byrne, the franchise tax is *220 imposed and collected by the State; the revenues it generates are general state revenues. The franchise tax statutes likewise provide formulae for the distribution and the apportionment of those revenues as state aid to eligible municipalities. N.J.S.A. 54:30A-24 and 24.1; 54:30A-60, 61 and 61.1. However, as Camden v. Byrne makes clear, the allocation formulae contained in the underlying statutes are not self-executing as an appropriation and therefore cannot serve as lawful authority for the expenditure of money from the State's general fund.
The two appropriations here in question provide statutory authorization to pay the state aid. Because they are appropriations they are subject to the Governor's line-item veto power. The Governor reduced the percentage in the first appropriation from 92.221235 to 67.811935. That action had the direct result of reducing the amount of state aid to eligible municipalities by $27 million. In the second paragraph he reduced $140 million to $125 million, further reducing the available appropriation by $15 million, and thus carrying out a total reduction of the state aid appropriation by $32 million.
Appellants also rely on the general principle that a governor may not invoke his power to veto items of appropriation to strike conditions or restrictions on the use of an appropriation without vetoing the accompanying appropriation as well. Welden v. Ray, 229 N.W.2d 706, 713 (Iowa Sup.Ct. 1975). That general rule, however, has no application to the circumstances presented here. The Governor did not change the municipalities which were eligible for aid (the existing law governs that). Nor did he alter the method of calculating or apportioning the aid (that is set forth in the separate statutes). The action he took was to reduce the percentage of increased aid for 1982 over 1981 and to lower the aggregate limit on the June 1983 aid payment. The direct effect of that action was to reduce the total amount of aid by $32 million and nothing more.
Appellants' basic complaint is that the Governor's line-item veto altered legislative intent regarding the size of the *221 state aid appropriation, and should be overturned for that reason. That position, however, completely ignores the constitutional role assigned to the Governor in the process by which bills, including those containing appropriations, become law. N.J. Const. (1947), Art. V, § I, pars. 14 and 15; Gilbert v. Gladden, 87 N.J. 275 (1981). It is well settled that legislative appropriation power includes the governor's prerogative, in the exercise of his discretion and judgment, to reduce or delete items of appropriation. N.J. Const. (1947), Art. V, § I, par. 15; Camden v. Byrne, 82 N.J. at 149-150. Not only is a court precluded from ordering the Legislature to make an appropriation; it is also without the power to compel the governor to recommend or to approve one. Camden v. Byrne, 82 N.J. at 150; Fitzgerald v. Palmer, 47 N.J. 106, 108 (1966); Gallena v. Scott, 11 N.J. 231, 238-239 (1953). Unquestionably the exercise of the line-item veto will alter legislative intent, at least insofar as it is expressed in an appropriation at the time the budget initially passes the Legislature. In the absence of a vote overriding the Governor's veto, however, the state of the appropriation following the Governor's line-item veto must ultimately stand as law.
Appellants argue in their reply brief that the franchise tax was implemented in place of the municipality's right to tax property, McKenney v. Byrne, 82 N.J. at 317, and therefore the funds belong to the municipalities without appropriation. That statement in McKenney, however, was made in the context of an equal protection challenge. The court there was attempting to establish a rational basis for the unequal apportionment among municipalities. Id. at 316-317. It was not intended to explain ownership of the funds.
By reducing the percentage of the public utilities franchise and gross receipts tax available, the Governor reduced a line item appropriation. This was a proper exercise of his power under N.J. Const. (1947), Art. V, § I, par. 15.

*222 IV
Senate Bill 1600 on lines 9-13, page 145, provided for the appropriation of $13,325,000 for the construction of additional facilities by the Department of Corrections. The bill not only provided funds for expenditures, but also added the following restriction:
The Department of Corrections is prohibited from placing a new correctional facility in a county with a population exceeding 85,000 but less than 100,000 in which another State correctional facility is located.
Governor Kean, claiming to exercise his line-item veto, deleted this prohibition.
Appellants contend that the Governor exceeded his power to eliminate or reduce "items of appropriation of money," granted by N.J. Const. (1947), Art. V, § I, par. 15, because "the Governor may not delete provisions specifying the purposes for which an appropriation is to be used or imposing valid conditions or restrictions thereon, because to do so would alter legislative intent with respect to the purposes of the appropriation and would constitute a creative use of the item veto power."
The Governor argues that he has an implied power to veto legislation which he believes to be unconstitutional. He states that the paragraph in question, which limits the placement of all new correctional facilities, violates the doctrine of separation of powers by restricting his power to administer State Government; violates the single object clause, N.J. Const. (1947), Art. IV, § VII, par. 4; amends an existing law by reference only to its title in violation of N.J. Const. (1947), Art. IV, § VII, par. 5, and is impermissible special legislation, N.J. Const. (1947), Art. IV, § VII, pars. 7, 8 and 9.
As we have hereinbefore stated, the Governor cannot veto an item in a bill on the basis of its unconstitutionality where that power is not otherwise granted. The Governor's partial veto does not extend to items contained in an appropriations bill which are not themselves appropriations. The fact that the item is unconstitutional does not give the Governor any *223 further right of partial veto. Although the issue has not been determined by our courts, as we have noted earlier, other states having similar constitutional provisions overwhelmingly hold that the fact that legislation may be unconstitutional does not give the Governor power to veto it where he has not otherwise been granted that power. Patterson v. Dempsey, 152 Conn. 431, 207 A.2d 739, 744-747 (Sup.Ct.Err. 1965); State ex rel. Stephan v. Carlin, 230 Kan. 252, 631 P.2d 668, 672-673 (Sup.Ct. 1981).
The item in question here creates a condition on the use of state funds to build new correctional facilities. We do not believe, however, that the appropriation in question is contingent upon this condition. Therefore, the condition cannot be regarded as an appropriation of money subject to the governor's veto. Moreover, even if it were, the condition could not be eliminated without eliminating the money appropriated.
Cenarrusa v. Andrus, 582 P.2d at 1092, is instructive on this point. There the veto power over items in an appropriation act was used to strike limitations of use upon which the grants were conditioned (e.g., "The appropriation herein made is specifically to be used ...") without changing the section itself. 582 P.2d at 1090. This use of the item veto was held to be an invalid usurpation of legislative power because it subverted the intent of the legislators who made the appropriation. Id. at 1092. The partial veto is a negative power, and must be exercised so as to eliminate or destroy the entire item without distorting the legislative intent, id., citing State ex rel. Sego v. Kirkpatrick, 86 N.M. 359, 524 P.2d 975, 981 (N.M.Sup.Ct. 1974).
The Supreme Court of Iowa also dealt with the question of the severability of conditional provisions in Welden v. Ray, 229 N.W.2d at 713-714. That court noted that all appropriations are qualified to a degree. Id. at 710. The power to condition appropriations is, on one hand, limited by the doctrine of separation of powers so as not to usurp the executive function of implementing appropriations. Id. at 710. On the other hand the executive is restrained from vetoing conditions while leaving *224 an appropriation intact because if he could do so, he would, in effect, legislate. Id. at 713. Thus qualifications placed on an appropriation by the Legislature are not subject to the line-item veto. Id. See, also, State ex rel. Sego v. Kirkpatrick, 524 P.2d at 981-982, cited in Welden v. Ray, 229 N.W.2d at 711:
The power of partial veto is the power to disapprove.... Thus, a partial veto must be so exercised that it eliminates or destroys the whole of an item or part and does not distort the legislative intent, and in effect create legislation inconsistent with that enacted by the Legislature, by the careful striking of words, phrases, clauses or sentences.
Connecticut has also found that "[H]ow much is spent is conceptually different from how an amount is spent [,]" and that therefore a governor may "control the amount of an expenditure, but not the purpose," Caldwell v. Meskill, 164 Conn. 299, 320 A.2d 788, 792 (Sup.Ct.Err. 1973), cited in Welden v. Ray, 229 N.W.2d at 712.
The test was aptly expressed by the Florida Supreme Court in Brown v. Firestone, 382 So.2d at 664:
[H]as the Legislature in the appropriations process determined that the appropriation is worthwhile or advisable only if contingent upon a certain event or fact, or is the qualification or restriction being used merely as a device to further a legislative objective unrelated to the fund appropriated?
Since the paragraph here under review was not tied to any particular appropriation in Senate Bill 1600 and thus may be read as barring the use of any funds from whatever source derived (i.e., bond issues), it more properly should be the subject of a separate legislative enactment that conforms to the constitutional requirements for passing a bill. See N.J. Const. (1947), Art. V, § I, par. 15.
The paragraph also attempts to amend the "Correctional Facilities Construction Bond Act of 1982," L. 1982, c. 120 (and its predecessors) without making reference to it by name. For example, § 5 of that law calls for the construction of a new medium security prison with the site to be determined. The Commissioner of the Department of Corrections is given the power to adopt regulations to carry out the act. The deleted paragraph usurps that Executive Branch function. In addition, *225 that section directs that to "the maximum extent feasible and possible, public lands should be given preferential status for utilization for the construction of any correctional facility." The paragraph would have attempted unlawfully to have amended that obligation.
The Governor also states that he deleted the language because it violated the constitutional doctrine that a legislative classification may not be drawn in an arbitrary manner, but rather should bear some overall relationship to the legislative objective. N.J. Const. (1947), Art. IV, § VII, pars. 7, 8 and 9, and, even if discrimination is intended and permissible through the enactment of special legislation, the Constitution prescribes certain mandatory procedures for the enactment of special laws which may not be avoided. Alfred Vail Mut. Assoc. v. New Shrewsbury, 58 N.J. 40, 51 (1971). Failure to follow those procedures is fatal to the enactment. Id.
The paragraph deleted unquestionably applied to Hunterdon County and no other, even though other counties, as does Hunterdon, have state correctional facilities within their borders. That classification, based only on an apparently arbitrarily selected population level, does not promote a legitimate governmental goal. Instead, it hinders the exercise of administrative discretion to find the most suitable sites for state correctional facilities, and that is clearly contrary to the mandates of other State statutes. See N.J.S.A. 30:1B-6 (setting forth powers of Commissioner of Corrections, including authority to determine all matters of policy and regulate the administration of the institutions within his jurisdiction) and L. 1982, c. 120, § 5 (directing siting of state correctional facilities on public land where possible without restriction as to a particular county).
The legislative classification barring the siting of state correctional facilities only in Hunterdon County solely because of the size of its population is arbitrary and hence unconstitutional. The classification is also constitutionally objectionable because it violates the doctrine of separation of powers, the *226 single-object clause and the prohibition against amending a law by reference only to its title.

V
Finally, appellants challenge the deletions of lines 70-72 and lines 78-81 of page 149 and the reduction of lines 73-77 on that same page. These items vetoed by Governor Kean specified uses to be made of appropriations for capital construction by the Department of Transportation. The entire appropriation made by Senate 1600 for capital construction by the Department of Transportation was $12,000,000. Of this amount, $7,000,000 was designated for use as matching funds for federally-aided interstate highway projects; the remaining $5,000,000 was to fund non-federal highway projects. 1983 Appropriations Handbook 448-449.
The use to be made of the money was further limited by the Legislature within the two categories of federal matching funds and State funds. The Governor used his line-item veto to change three of those limitations.[9]
Although the Governor reduced or deleted certain funds earmarked for specific purposes within the general appropriations, he did not reduce the lump sum appropriation of $12,000,000, or *227 the sums allocated as federal matching funds ($7,000,000) or to state projects ($5,000,000) by a corresponding amount.
Our discussion heretofore with respect to the applicability of the item veto to items other than items of appropriation of money is applicable here. The veto may not be used to delete an item unless it appropriates money, regardless of the constitutionality or unconstitutionality of the item.
The Governor does not argue here, however, that he has a right to veto certain lines because they are unconstitutional. His contention is that these items, which in effect subdivided the appropriations into sums allocated for specific purposes, are in themselves items of appropriation of money subject to his veto power. We do not find his contention to be consistent with the policy of limiting the partial veto to prevent its use by the Governor in an affirmative manner so as to thwart legislative intent.
The Governor, in support of his action here, relies on cases from other jurisdictions that have specifically considered this issue (and interpreting similar constitutional language giving the line-item power) which have upheld the executive's right to reduce or eliminate specific appropriations without reducing by a like amount the total appropriation in which the specific item is included, e.g., Reardon v. Riley, 10 Cal.2d 531, 76 P.2d 101 (Sup.Ct. 1938); Green v. Rawls, 122 So.2d 10 (Fla.Sup.Ct. 1960); State ex rel. Brotherton v. Blankenship, 214 S.E.2d 467, 481-483 (W. Va.Sup.Ct. 1975).
In Reardon v. Riley the California Legislature passed a bill appropriating $1,625,185 to the Department of Industrial Relations. Within that larger appropriation were two smaller appropriations of $328,000 and $20,000 for designated programs. The governor, acting pursuant to his authority to "reduce or eliminate any one or more items of appropriation of money while approving other portions of the bill" [then Calif. Const. Art. 4, § 34], eliminated the two specific lesser included appropriations. He then reduced the total departmental appropriation of $1,625,185 *228 not to $1,277,185 (the total left after subtraction of the two vetoed sums) but to $1,397,185. The California Supreme Court held that the elimination of the specific items did not reduce the general departmental appropriation; that was reduced only to the extent the governor specifically reduced it, to $1,397,185. The court reasoned such an approach not only gave full effect to the governor's power to reduce or eliminate items of appropriation, but also preserved his authority to approve appropriations.
Noting that the Legislature did not override the governor's veto, the California court concluded that:
it was the original legislative intent to appropriate $1,625,185 to the department regardless of the subsequent fate of the specific and included items of further appropriation and that the Governor, within the power conferred upon him by the Constitution, could properly, in his judgment, reduce the general appropriation in the manner above indicated.
This action upon his part did not, in our opinion, thereby improperly increase an appropriation without legislative action, nor did it constitute an unauthorized veto of conditional or provisional language used in connection with the specific and included items of appropriation. It was an "elimination" of the specific and included items and a reduction of the general and inclusive item of appropriation. Such a conclusion appears to effectuate the intent of the Legislature without depriving the Governor of the full effect of the veto power granted him. [76 P.2d at 103-104]
See, also, Cal. Railroad Comm. v. Riley, 12 Cal.2d 48, 82 P.2d 394 (Sup.Ct. 1938); Pomeroy v. Riley, 12 Cal.2d 166, 82 P.2d 697 (Sup.Ct. 1938).
The same result was reached in Brown v. Firestone, 382 So.2d at 669-670. An appropriation was there defined as "the smallest identifiable fund to which a qualification or restriction is or can be directly and logically related." Id. at 668. This necessarily includes situations "where a qualification or restriction includes the setting apart of an identifiable sum of money[.]" Id. at 668.
If the smallest identifiable sum of money in an appropriations bill is subject to the power of the Governor's partial veto, then lines 70-72, which designate $1,000,000 "(o)f the amount hereinabove *229 appropriated" for the reconstruction of the Laurelton Circle, and lines 73-77, which make $700,000 of the same general appropriation available for the construction of a vehicular bridge across Overpeck Canal, would be subject to the item veto, and the Governor's action deleting the former and reducing the latter sum would be proper.
A less literal interpretation of what constitutes an "item of appropriation of money" is, in our judgment, however, more consistent with the reasons for which the item veto was established. We conclude that the portions of the appropriations vetoed by the Governor were conditions upon which the appropriations were made, and thus could not be deleted or otherwise changed without a corresponding change in the amount of the general appropriation, see Welden v. Ray, 229 N.W.2d at 710-714; Brown v. Firestone, 382 So.2d at 664. It is hypertechnical to say that lines 70-72 and 73-77 are independent appropriations because they phrased the conditions placed on the overall appropriation in terms of numbers. The salient fact is that the Legislature intended that certain portions of the whole sum be used for specific purposes, and that the legislators apparently took this into account in determining the total amount to be appropriated. If, for example, the Legislature knew that the $1,000,000 which it had earmarked for repairs to the Laurelton Circle would be used for other purposes, it very well might have reduced the total amount sought to be appropriated by that amount. The directives eliminated by the Governor are, we believe, in the nature of provisos on the appropriation of the funds rather than distinct appropriations.
Lines 78-81, also deleted, do not present the same problem because they do not establish any specific monetary amount. That item designates the "[f]unds hereinabove" as available as matching funds and for the purchase of the right-of-way of Route 541. This is a permissible condition upon the appropriation, *230 see Welden v. Ray, 229 N.W.2d at 710. We find that the appropriation was contingent upon this condition which specifically provides how that particular money was to be used. Such a condition cannot be vetoed, because if the Governor could veto conditions placed on appropriations, he would be legislating.
The Governor urges that it must be considered the legislative intention that the lesser appropriations are to be excluded from L. 1982, c. 49, while the larger appropriations remain part of the law. Because of his constitutional role in the appropriations process, the legislative intention as to the meaning of an appropriations act must be gleaned not only from the actions of the Legislature in initially adopting a budget, but from his actions in approving and disapproving appropriations, and the legislative reaction to his line-item vetoes as well. Since it did not seek to amend the act to reduce the aggregated amount, the Legislature thus must be deemed, he claims, to have acquiesced in his judgment because it did not override his line-item veto. In fact, it did not even attempt to do so.
The fact that the Legislature did not act to override the Governor's item veto cannot serve to validate an unconstitutional exercise of the item veto power. The simple answer to the Governor's argument is that the gubernatorial veto can be overriden only by a vote of two-thirds of the members of each House, N.J. Const. (1947), Art. V, § I, par. 15. To permit an unconstitutional exercise of the item veto power to stand, absent a vote of two-thirds of the members of each House, would be to deprive the Legislature of its constitutional right to enact an appropriations bill composed of items of its own choosing by majority vote, N.J. Const. (1947), Art. IV, § IV, par. 6. Henry v. Edwards, 346 So.2d 153, 157 (La.Sup. 1977).

VI
Considering the foregoing we conclude:
*231 (a) The Governor did not have authority under N.J. Const. (1947), Art. V, § I, par. 15, to veto paragraphs 34 through 41 and paragraph 47 of Senate 1600 because those paragraphs are not "items of appropriation of money." However, the language of these paragraphs placed broad restrictions on the Governor's ability to administer State government, vested executive responsibilities in a legislative subcommittee and amended permanent laws without specific reference thereto, thus violating provisions of the State Constitution. Paragraphs 34 through 41 and 47 of the appropriations act are accordingly found to be void and of no effect;
(b) Since the public utilities franchise and gross receipts tax revenues are state funds by virtue of N.J.S.A. 54:30A-16 et seq. and 54:30A-49 et seq., the Governor properly exercised his authority to veto items of appropriation pursuant to N.J. Const. (1947), Art. V, § I, par. 15 when he reduced the amount of state aid to certain municipalities;
(c) The Governor's veto of the restriction upon the use of funds appropriated to the Department of Corrections for capital construction is invalid because the restriction is not an "item of appropriation of money." The restrictive language, however, violates several constitutional principles, as explained herein, and is therefore found to be void;
(d) By vetoing monies appropriated to the Department of Transportation for specific construction projects without returning the monies to the general fund as surplus revenue, the Governor transferred funds from one purpose to another in excess of his item veto power under N.J. Const. (1947), Art. V, § I, par. 15. We uphold the veto but determine that the funds involved must be returned to the general fund, and
(e) The failure of the Legislature to override the Governor's line-item veto of certain appropriations to the Department of Transportation does not serve to validate his improper exercise of the item veto power.
NOTES
[1] No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; except that when a change in the fiscal year is made, necessary provision may be made to effect the transition. No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor.
[2] If any bill presented to the Governor shall contain one or more items of appropriation of money, he may object in whole or in part to any such item or items while approving the other portions of the bill. In such case he shall append to the bill, at the time of signing it, a statement of each item or part thereof to which he objects, and each item or part so objected to shall not take effect. A copy of such statement shall be transmitted by him to the house in which the bill originated, and each item or part thereof objected to shall be separately reconsidered. If upon reconsideration, on or after the third day following said transmittal, one or more of such items or parts thereof be approved by two-thirds of all the members of each house, the same shall become a part of the law, notwithstanding the objections of the Governor. All the provisions of the preceding paragraph in relation to bills not approved by the Governor shall apply to cases in which he shall withhold his approval from any item or items or parts thereof contained in a bill appropriating money.
[3] (b) A passed bill presented to the Governor shall become law:

(1) if the Governor approves and signs it within the period allowed for his consideration; or,
(2) if the Governor does not return it to the house of origin, with a statement of his objections, before the expiration of the period allowed for his consideration; or,
(3) if, upon reconsideration of a bill objected to by the Governor, two-thirds of all the members of each house agree to pass the bill.
[4] LANGUAGE"
On Page 173: Section 34, "No sums shall be transferred into salaries and wages from State aid, special purpose, or grant accounts without the prior approval of the Subcommittee on Personnel of the Joint Appropriations Committee."
The quoted language is deleted in its entirety.
On Page 173: Section 35, "The Director of the Division of Budget and Accounting is hereby authorized to review the total complement of positions now maintained among the various Executive Departments and abolish 2,500 vacant budgeted positions exclusive of those positions that are vital to the safety and health of the residents in our State institutions, the State Police, or other critically important functions of the government."
The quoted language is deleted in its entirety.
On Page 173: Section 36, "As of July 1, 1982, all full-time salaried vacant authorized, special services and temporary positions supported by the funds hereinabove appropriated, exclusive of federal funds appropriated by language, and exclusive of those positions in the Legislature, the Office of the Chief Executive, and the Judiciary, are abolished."
The quoted language is deleted in its entirety.
On Page 174: Section 37, "Any new full-time salaried authorized, special services or temporary positions in the various departments of State government, exclusive of Rutgers, the State University, the University of Medicine and Dentistry, the New Jersey Institute of Technology, the Legislature, the Office of the Chief Executive, and the Judiciary, from the sums hereinabove appropriated, exclusive of federal funds appropriated by language, shall not be created without the prior approval of the Subcommittee on Personnel of the Joint Appropriations Committee."
The quoted language is deleted in its entirety.
On Page 174: Section 38, "The Legislative Budget Officer, or his designated representative, shall provide administrative assistance to the Subcommittee on Personnel of the Joint Appropriations Committee. No action shall be taken by the Subcommittee on Personnel except upon a submission by the Division of Budget and Accounting. If the Subcommittee on Personnel fails to act on any matter requiring its approval within 10 days of such a submission, then through the Legislative Budget Officer, the Legislative Budget Officer shall approve the matter. The Chairman of the Subcommittee on Personnel is authorized to certify actions taken by the Subcommittee on Personnel."
The quoted language is deleted in its entirety.
On Page 174: Section 39, "No employee shall be paid a cash salary rate in excess of $59,000 per year unless the Subcommittee on Personnel of the Joint Appropriations Committee has approved such rate. The aforesaid salary limitations shall be applicable to all State employees including employees of the University of Medicine and Dentistry, Rutgers, the State University and the New Jersey Institute of Technology, but shall exclude employees of the Legislature, the Chief Executive Office, and the Judiciary."
The quoted language is deleted in its entirety.
On Page 174: Section 40, "No salary adjustment except those made in accordance with rules and regulations governing salary range and rates of pay shall be paid in any State department, agency, commission or higher education institution without the approval of the Subcommittee on Personnel of the Joint Appropriations Committee. Nothing herein shall be construed as applicable to the personnel of the Legislature, the Judiciary, or the Office of the Chief Executive."
The quoted language is deleted in its entirety.
On Page 174: Section 41, "The Subcommittee on Personnel of the Joint Appropriations Committee is hereby authorized to direct the Director of the Division of Budget and Accounting and the President of the Civil Service Commission to adopt such rules and regulations concerning salary limitation and related to the submission of matters for approval by the Subcommittee on Personnel of the Joint Appropriations Committee."
The quoted language is deleted in its entirety.
On Page 175: On Section 47, "If, as a result of an insufficiency of appropriations in any program account, it is required or determined that there will be a reduction in the number of State offices, positions or employees in that program account, the head of the department which administers the program shall effect that reduction in personnel from among all offices, positions or employment at salaries which exceed $15,000.00 in the unclassified service of the civil service before effecting any reduction in personnel from the classified service."
The quoted language is deleted in its entirety.
[5] Art. V, § I, par. 11, of our Constitution precludes the Governor from proceeding against the Legislature in legal proceedings of any nature.
[6] On page 143: Lines 56-65, "Notwithstanding the provisions of C.54:30A-24.1 and C.54:30A-61.1, public utilities franchise and gross receipts tax payments to those municipalities apportioned pursuant to those sections in an amount in 1982 greater than that received in 1981, shall be limited to an amount equal to that which each such municipality received in 1981 plus an amount equal to (92.221235) percent of the difference between the amount each received in 1981 and the amount each is apportioned in 1982 to those sections; provided, however, that the amount not distributed shall be anticipated as revenue for general State Purposes." The number within the brackets is reduced to 67.811935.

On page 143: Lines 65A-65F, "Notwithstanding the provisions of C.54:30A-24.1 and C.54:30A-61.1, the payments to municipalities from the public utilities franchise and gross receipts taxes in June, 1983 shall be limited in the aggregate to ($140) million in the manner outlined above and any amount collected in excess of this sum shall be anticipated as revenue for general State purposes." The amount in brackets is reduced to $125.
[7] Franchise taxes on utilities using public streets other than those taxed by N.J.S.A 54:30A-49 et seq. are taxed by N.J.S.A. 54:30A-16 et seq. Gross receipts from that tax are apportioned pursuant to N.J.S.A. 54:30A-24. All of the discussion pertaining to the collection of taxes raised by N.J.S.A. 54:30A-49 et seq. is applicable here. L. 1980, c. 10, § 2 [codified at N.J.S.A. 54:30A-24.1], accomplished the same reforms regarding a cap on aid, and the conversion of the tax proceeds into State revenue, L. 1980, c. 10, § 1 [codified at N.J.S.A. 54:30A-24], as did L. 1980, c. 11, § 3.

The third bill in the reform package, L. 1980, c. 12, § 1 [codified at N.J.S.A. 54:1-46 et seq.], establishes a "Municipal Purposes Tax Assistance Fund" as a repository of some unallocated excess gross receipts tax revenues intended to provide State aid to needy municipalities.
[8] The amount of money expected to be appropriated to the eligible municipalities from the proceeds of the public utility franchise tax is estimated in numerical terms even though the appropriation of such State aid is accomplished by language. Thus, the amount of money actually appropriated in FY 1981 (ending June 30, 1981) was $480,302,231. It is estimated that $564,700,000 will be given in aid in FY 1982 (ending June 30, 1982) and (as of March 15, 1982) that $595,000,000 will be appropriated in FY 1983 (ending June 30, 1983). Source: Budget Message of Governor Kean, March 15, 1982, "Statement of Estimated Revenues and Expenditures, Schedule II, Appropriated Revenues, General Fund," p. 9c.
[9] OF TRANSPORTATION"
On Page 149A: Lines 70-72, "Of the amount hereinabove appropriated, $1,000,000 in funds shall be made available for the reconstruction of Laurelton Circle, Ocean County." The quoted language is deleted in its entirety.
On Page 149A: Lines 73-77, "Of the amount hereinabove appropriated, [$700,000] shall be made available for construction of a vehicular bridge across Overpeck Canal in the vicinity of Cedar Lane and Sheffield Avenue, Englewood, with access road to Route 4."
The amount in brackets is reduced to $70,000.
On Page 149A: Lines 78-81, "Funds hereinabove shall be available as matching funds for federal monies derived from the dedesignation of I-895 and such funds shall be used to purchase the right-of-way of Route 541." The quoted language is deleted in its entirety.