617 A.2d 223

COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, AND ROBERT W. PURSELL, PLAINTIFFS–APPELLANTS, v. JIM FLORIO, IN HIS CAPACITY AS GOVERNOR, STATE OF NEW JERSEY, ANTHONY CIMINO, INDIVIDUALLY AND IN HIS CAPACITY AS COMMISSIONER, DEPARTMENT OF PERSONNEL, AND SAMUEL CRANE, INDIVIDUALLY AND IN HIS CAPACITY AS STATE TREASURER, DEFENDANTS–RESPONDENTS.

JOHN HARTMANN, DICK LAROSSA, PETER INVERSO, PAUL KRAMER, ROBERT SINGER, MELVIN COTTRELL, AND BARBARA WRIGHT, PLAINTIFFS–APPELLANTS, v. JIM FLORIO, IN HIS CAPACITY AS GOVERNOR, STATE OF NEW JERSEY, ANTHONY CIMINO, INDIVIDUALLY AND IN HIS CAPACITY AS COMMISSIONER, DEPARTMENT OF PERSONNEL, AND SAMUEL CRANE, INDIVIDUALLY AND IN HIS CAPACITY AS STATE TREASURER, DEFENDANTS–RESPONDENTS.

Argued October 13, 1992—Decided December 29, 1992.

*Steven P. Weissman* argued the cause on behalf of appellants Communications Workers of America, AFL–CIO and Robert W. Pursell.

*Michael T. Hartsough* argued the cause for appellant Dick LaRossa (*Hartsough, Kenny, Innes & Kline,* attorneys).

*Angelo J. Onofri* argued the cause for appellants John Hartmann, et al. (*McCarthy and Schatzman,* attorneys).

*Robert J. Del Tufo,* Attorney General of New Jersey, argued the cause for respondents (*Robert J. Del Tufo,* attorney; *Edward J. Dauber,* Executive Assistant Attorney General, of counsel; *Joseph L. Yannotti, Jack M. Sabatino,* and *Mark J. Fleming,* Assistant Attorneys General, *Bertram P. Goltz, Jr., Donald M. Palombi, Carol A. Blasi, June K. Forrest,* and *Lewis A. Scheindlin,* Deputy Attorneys General, on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

These joint appeals arise from lawsuits raising identical issues that challenge the Governor's refusal to implement employee layoffs in the manner mandated by the Legislature in the 1993 Fiscal Year Appropriations Act, *L.* 1992, *c.* 40 (the "Appropriations Act" or the "Act"), as amended by Senate Bill 996, *L.* 1992, *c.* 99, (the "Appropriations Amendments" or "Senate Bill 996"). Unlike the language of the original Appropriations Act that obligated the Governor "whenever possible" to avoid the layoff of career State employees, the language of Senate Bill 996 is mandatory and directs that personnel reductions *shall* be accomplished by layoffs of managerial and other exempt personnel outside the collective bargaining units.

The critical issue is whether the Act, as amended by Senate Bill 996, violates the separation-of-powers provision of the New

Jersey Constitution, article III, paragraph 1, by allowing the Legislature to interfere excessively with the Governor's constitutional authority to manage government.

## I

### A. *The 1993 Appropriations Act*

On June 25, 1992, the New Jersey Legislature passed the Appropriations Act. The Act directed that various departments of State government accomplish personnel savings through staff reduction. Specifically, most departmental appropriations contained a proviso that authorized the intra-departmental transfer of funds

> from the other appropriations made for Salaries and wages in the department to reflect savings throughout the department from the reduction of employees whose annual salaries exceed $50,000. Such savings shall first be made by reduction of employees in the unclassified service. If those reductions in the unclassified service are insufficient, additional reduction of employees shall be made in the classified service. These reductions shall be made among management and administrative personnel and shall, to the maximum extent possible, not affect direct service personnel. If reductions are made of employees in the classified service, the commissioner shall provide written notice and justification of such action to the Director of the Division of Budget and Accounting and the Joint Budget Oversight Committee. [S. 1000, § 1 (Department of Banking Appropriations).]

Additionally, in a provision applying to all appropriations, the Act stated:

> 38. Notwithstanding the provisions of any law to the contrary, no State Troopers, corrections officers or personnel providing services in any institution operated by the State shall be laid off. Whenever possible, layoffs shall exclude those employees of any department who provide direct services and shall also exclude career employees who have occupied the same job title for at least five years or who have ten years of State service. [S. 1000, § 38.]

On June 26, 1992, the Governor vetoed the Act, and on June 30, 1992, the Legislature overrode the Governor's veto, and the Appropriations Act became law.

### B. *Senate Bill 996—The Amendment to the Appropriations Act*

On June 29, 1992, the Legislature approved an amendment to the Appropriations Act. Senate Bill 996 amended section 38 to

add communications operators, security guards, alcoholic beverage control inspectors, and marine police officers to the list of employees who could not be laid off. Senate Bill 996 also deleted the discretionary "whenever possible" language of section 38 and replaced it with the following mandatory language:

> Savings required to be realized through the reduction of personnel shall be made by the reduction of managerial and other exempt personnel outside the collective negotiations units in the unclassified service, and then, if necessary, by the reduction of managerial and other exempt personnel outside the collective negotiations units in the career service. As used in this section, managerial and other exempt personnel means employees assigned to employee relations groupings X, M, D, E, V, Z, Y and W. [S. 996, § 1.]

The employee-relations groupings listed in the amendment are among the higher paid of State workers and are exempt from union representation, based on either their managerial or confidential status.

On September 10, 1992, Governor Florio vetoed Senate Bill 996. In his veto message, the Governor stated that "[w]ithin the confines of [the Appropriations Act] and the massive cuts enacted by the Legislature, I agree wholeheartedly with the spirit of that priority list. And, as interpreted by the Attorney General, I believe this language is sufficiently permissive that it does not run afoul of the State Constitution." However, the Governor stated that the mandatory provisions of the Appropriations Amendment are "a completely different matter" that "would impose upon the Executive Branch a series of restrictions that would clearly interfere in the Executive's constitutional duty to manage government."

On September 14, 1992, the Legislature overrode the Governor's veto, and Senate Bill 996 became law.

### C. *The Executive Branch's Response to the Act*

The Governor sought advice from the Attorney General concerning the constitutionality of the Appropriations Act and the

Appropriations Amendments. The Attorney General in a letter opinion dated July 2, 1992, advised the Governor that the personnel reduction language in the Appropriations Act as drafted was permissive and hence did not violate the separation-of-powers doctrine. As the Attorney General read the Appropriations Act, "the legislative directive does not differ significantly from existing Department of Personnel practices (as embodied in statutes and regulations) governing reductions in force." (citations omitted). He therefore concluded:

> We reasonably may read the conditional budgetary language as referring to and being consonant with existing statutory and administrative practice. In this way, the conditional language does not interfere with the substantial degree of discretion agencies have to marshal the resources appropriated to carry out the many statutory duties.

However, the Attorney General then wrote that if the personnel reduction language were read as dictating particular staffing decisions for each agency, it would be unconstitutional. He also concluded that the exemption of certain classes of employees from layoff violated the separation of powers because those categorical exemptions "could severely hamper the Governor's discretion as to how to administer the government efficiently with fewer employees."

Based on the Attorney General's opinion, on July 2, 1992, the Governor's Chief Counsel issued a directive to all members of the Governor's cabinet instructing them "not to follow the language provisions which [the Attorney General] has identified as unconstitutional."

In response to the Appropriations Act, the State departments prepared layoff plans, which they submitted to the Commissioner of the Department of Personnel, Anthony Cimino, for his review. On or about July 10, 1992, the Commissioner wrote to several department heads, informing them that their layoff plans were unacceptable "because, among other reasons, the management reductions that are made disproportionately impact employees in lower salaried ranges represented by bargaining units." On August 5, 1992, the Commissioner approved all department layoff plans and so notified each department

head. Based on the various plans, the State was to lay off 1,459 employees on October 2, 1992.

According to plaintiff Communications Workers of America, AFL–CIO (the "CWA"), the union represents approximately 900 of the employees that were slated for layoff. Only 450 employees of the 1,459 were from the unclassified or managerial ranks. In its amended notice of appeal, CWA asserts that the "vast majority of employees who have been targeted for layoff on or about October 2, 1992 receive annual salaries of less than $50,000. Hundreds of targeted employees, performing vital clerical and other functions, earn less than $20,000 per year." CWA further asserts that "[a]lthough there are approximately 6,000 unclassified employees in State government, of the 1,500 employees targeted for layoff, fewer than one-third are in the unclassified service. The vast majority of employees to be laid off are not managerial or exempt personnel * * *."

D. *Letter from the Office of Legislative Services in Response to the Opinion Letter of the Attorney General*

On August 7, 1992, the Executive Director of the Office of Legislative Services, Albert Porroni, issued a letter to the Senate President and General Assembly Speaker in which he disagreed with the Attorney General's opinion letter of July 2, 1992. According to Porroni,

In times of economic distress, such as result in the revenue shortfalls expected by this State in the prior and current fiscal years, the Legislature may determine that sufficient funds are not available to fully fund all programs or projects. Policy determinations must be made. The Legislature may choose not to fund programs at all, to partially fund programs or to establish priorities within programs. *See City of Camden v. Byrne,* 82 *N.J.* 133 [411 *A.*2d 462] (1980). Contrary to the conclusion of the Attorney General, such determinations and priorities are for the Legislature, not the Executive Branch, to make. Once the Legislature establishes its priorities, the Executive Branch must administer existing programs within the limits of those priorities.

Because the Legislature viewed its establishment of restrictions as a constitutional act in furtherance of its appropriations powers, Porroni concluded that "we are of the opinion that the Legislature, by law, may direct certain administrative aspects

of the State Government[,] especially those rationally related to an appropriation or fiscal policy."

### E. *Procedural History*

On August 12, 1992, the CWA and Robert W. Pursell, plaintiffs, commenced an action in the Law Division against defendants, Governor Jim Florio, Commissioner of Personnel Anthony Cimino, and State Treasurer Samuel Crane. Plaintiffs seek a judgment that defendants are in violation of the Act and an order enjoining defendants from violating the Act and directing the rescission of all layoff notices served on employees in violation of the Act. On September 25, 1992, the Law Division granted defendants' motion to transfer Count 1 of the Complaint to the Appellate Division. Another count in that complaint is not before us.

On September 29, 1992, John Hartmann, a member of the New Jersey General Assembly, filed a complaint in the Law Division against Governor Florio, Commissioner Cimino, and Treasurer Crane, demanding the same relief as requested by CWA in its action. On September 29, 1992, Assemblyman Hartmann filed an amended complaint in the Law Division, in which Dick LaRossa and Peter Inverso, members of the New Jersey Senate, and Paul Kramer, Robert Singer, Melvin Cottrell, and Barbara Wright, members of the General Assembly, joined as party plaintiffs. On October 1, 1992, the legislators filed a verified amended complaint.

On October 2, 1992, CWA filed an amended complaint in the Appellate Division, which it termed an "amended notice of appeal." The legislators' suit was consolidated on appeal with CWA's suit. Plaintiffs also filed an application for emergent relief enjoining the layoff of State employees scheduled for October 2, 1992. The Appellate Division, with one judge dissenting, denied the application for a stay pending appeal. Plaintiffs brought a motion for a stay to this Court, and on October 2, 1992, Justice Handler granted a stay of the layoffs pending review by the full Court on October 5, 1992. On that

date, the Court vacated the stay but directly certified the consolidated appeals pursuant to *Rule* 2:12–1.

## II

A. *The Separation-of-Powers Provision*

Article III, paragraph 1 of the New Jersey Constitution reads:

> The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

The doctrine of separation of powers is a fundamental principle of our State government. The separation-of-powers article first appeared in substantially its present form in the New Jersey Constitution of 1844. It was designed to "maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of unchecked power in the hands of any one branch." *David v. Vesta Co.,* 45 *N.J.* 301, 326, 212 *A.*2d 345 (1965) (footnote and emphasis omitted).

Despite the explicit constitutional mandate that "contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch," *Knight v. Margate,* 86 *N.J.* 374, 388, 431 *A.*2d 833 (1981), we have always recognized that the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government. *General Assembly v. Byrne,* 90 *N.J.* 376, 382, 448 *A.*2d 438 (1982); *Knight v. Margate, supra,* 86 *N.J.* at 388, 431 *A.*2d 833; *Brown v. Heymann,* 62 *N.J.* 1, 11, 297 *A.*2d 572 (1972).

In one of the first cases to address the separation-of-powers doctrine under the 1947 Constitution, Chief Justice Vanderbilt recognized that a rigid and inflexible classification of the branches of government into mutually-exclusive, water-tight

compartments would "render government unworkable." *Massett Bldg. Co. v. Bennett*, 4 *N.J.* 53, 57, 71 *A.*2d 327 (1950). More recently we expressed the same thought in *In re Salaries for Probation Officers*, 58 *N.J.* 422, 425, 278 *A.*2d 417 (1971): "The compartmentalization of governmental powers among the executive, legislative and judicial branches has never been watertight."

We understand that "[i]nevitably some osmosis occurs when the branches touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others." *Knight v. Margate, supra*, 86 *N.J.* at 388, 431 *A.*2d 833. The aim of the separation-of-powers doctrine is not to prevent such cooperative action, but to guarantee a system in which one branch cannot "claim[ ] or receiv[e] an inordinate power." *Brown v. Heymann, supra*, 62 *N.J.* at 11, 297 *A.*2d 572.

The parties disagree on whether the Appropriations Act, as amended, encroaches on the Executive's power, and they present a "parade of horribles" that will result if the other's position prevails. CWA and the plaintiff legislators argue that to sustain the Governor's position will require them to give the Governor a "blank check" in the appropriations process. The Governor argues that to sustain the plaintiffs' position will allow the Legislature to micromanage the Executive branch. Both sides claim that their own layoff plan is efficient and effective, and that the adversary's plan will result in the chaotic disruption of government services.

The executive branch contends that the Appropriations Amendments impermissibly intrude on the Governor's constitutional authority to administer appropriated funds, which includes the making of specific staffing and resource-allocation decisions. The Governor claims that if government is to operate efficiently and effectively, the selection and assignment of necessary personnel and the decisions concerning how best to effectuate a reduction in force must reside in the executive

branch. The Legislature's attempt to control the order of layoffs both usurps and thwarts the Governor's duty to make staffing and resource allocations, which are an essential part of the Executive's day-to-day management of that branch of government.

Plaintiffs, on the other hand, assert that the amended Appropriations Act does not impermissibly intrude on the Governor's power because it does not unduly restrict his ability to choose the employees he will lay off. Plaintiffs allege that because the State has so many managers and the Act requires so few layoffs, the Governor has sufficient options under the amendment to function effectively.

To determine whether in enacting Senate Bill 996 the Legislature impermissibly intruded on the Governor's authority, we first examine the power and authority given to the legislative and executive branches of government under the 1947 Constitution.

## B. *The Legislature's Power*

The Legislature's power to appropriate funds for the operation of State government derives from several constitutional provisions.

The legislative power shall be vested in a Senate and General Assembly. [*N.J. Const.* art. IV, § 1, ¶ 1.]

All bills for raising revenue shall originate in the General Assembly; but the Senate may propose or concur with amendments, as on other bills. [*N.J. Const.* art. IV, § 6, ¶ 1.]

No money shall be drawn from the State treasury but for appropriations made by law. [*N.J. Const.* art. VIII, § 2, ¶ 2.]

■ "New Jersey courts have consistently adhered to the principle that the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government." *City of Camden v. Byrne,* 82 *N.J.* 133, 148, 411 *A.*2d 462 (1980). We reaffirm our commitment to that fundamental constitutional principle.

■ The Constitution, however, sets no specific standards or rules for determining the content of an appropriations act. That allows for some flexibility and discretion in the appropriation process. *Karcher v. Kean*, 97 *N.J.* 483, 491, 479 *A.*2d 403 (1984). Appropriation enactments customarily include conditions, restrictions, or limitations on the expenditure of appropriated funds. The power to impose such conditions is inherent in the power to appropriate. *Id.* at 492, 479 *A.*2d 403. But as with all legislative enactments, those statutory conditions must comport with the constitutional principle of separation of powers.

In 1983, New Jersey legislators took Governor Kean to court after he exercised his line-item veto on provisions of the 1983 Appropriations Act. The legislators argued that the line-item veto power extended only to items of appropriation of money and not to conditions on those appropriations. One of the vetoed conditions was similar to the provisions at issue here. Paragraph 47 of Senate Bill 1600 stated:

> If, as a result of an insufficiency of appropriations in any program account, it is required or determined that there will be a reduction in the number of State offices, positions or employees in that program account, the head of the department which administers the program shall effect that reduction in personnel from among all offices, positions or employment at salaries which exceed $15,000.00 in the unclassified service of the civil service before effecting any reduction in personnel from the classified service. [*In re Karcher*, 190 *N.J.Super.* 197, 209 n. 4, 462 *A.*2d 1273 (App.Div.1983), *aff'd in part, rev'd in part, Karcher v. Kean, supra*, 97 *N.J.* 483, 479 *A.*2d 403.]

The Attorney General successfully argued before the Appellate Division that that provision would "infringe[ ] unconstitutionally on the Governor's day-to-day administration of government." 190 *N.J.Super.* at 210, 462 *A.*2d 1273. That "excessive intrusion[ ]" would "impede the Governor's duty to execute the law, and result in an impermissible arrogation of power to the Legislature." *Ibid.* After citing several cases from other jurisdictions in support of the proposition that the Legislature cannot administer already-appropriated funds without usurping executive branch power, the Appellate Division held that para-

graph 47 was unconstitutional because it violated the separation-of-powers doctrine.

When the case came before this Court, we approved the Governor's use of the line-item veto to eliminate paragraph 47. We therefore did not reach the separation-of-powers issue, although we noted that "[i]t may be that these particular provisions offend relevant constitutional doctrine * * *." 97 *N.J.* at 504, 479 *A.*2d 403.

In *Karcher* we recognized that the power of the purse is an awesome power. The scope of that power makes vital the observance of its limits, lest the power concentrated in the hands of the Legislature overwhelm the coordinate branches and upset the constitutional scheme of shared but separate powers.

> "[I]f through the appropriation process, the Legislature were able to compel the Governor either to accept general legislation or to risk forfeiture of appropriations for a department of government, the careful balance of powers struck in [the state constitution] would be destroyed, and the fundamental principle of separation of powers * * * would be substantially undermined." [*Id.* 97 *N.J.* at 507–08, 479 *A.*2d 403 (citing *In re Opinion of the Justices,* 294 *Mass.* 616, 2 *N.E.*2d 789 (1936)).]

Similar fears were voiced by Justice Schreiber in *Enourato v. New Jersey Building Authority,* 90 *N.J.* 396, 415, 448 *A.*2d 449 (1982) (Schreiber, J., dissenting and concurring): "Legislative control over appropriations purse strings does not warrant violation of the constitutional separation of powers. Otherwise the Legislature could through this mechanism direct the operations of all executive functions."

## C. *The Governor's Powers*

The Governor's power and duty to execute the laws is also set forth in the New Jersey Constitution.

> The executive power shall be vested in the Governor. [*N.J. Const.* art. V, § 1, ¶ 1.]

> Each principal department shall be under the supervision of the Governor. The head of each principal department shall be a single executive unless otherwise provided by law. Such single executives shall be nominated and appointed by the Governor, with the advice and consent of the Senate, to serve

at the pleasure of the Governor during his term of office and until the appointment and qualification of their successors, except as herein otherwise provided with respect to the Secretary of State and the Attorney General. [*N.J. Const.* art. V, § 4, ¶ 2.]

Article V, section 4, paragraph 2 is aimed at pinpointing responsibility and control of the departments within the executive branch. The Governor appoints department heads who serve under his supervision and serve at his pleasure.

Paragraphs 4 and 5 of article V, section 4, further implement the powerful-executive approach. Paragraph 4 gives the Governor direct control over departments where the head of the department is a board and commission. Paragraph 5 gives the Governor power to investigate the conduct of executive branch officials and to discipline them. Of course, to avoid violating the separation-of-powers doctrine, the Governor does not have such power over members of the Legislature or the judicial branch. Robert F. Williams, *The New Jersey State Constitution, A Reference Guide*, 91–92 (1990) (hereinafter Williams, *N.J. State Constitution*).

Additionally, to prevent the Legislature from exercising inordinate power over the other branches of government through its power of the purse, the 1947 Constitution gave the Governor a "vital constitutional role in the budget process." *Karcher v. Kean, supra,* 97 *N.J.* at 489, 479 *A.*2d 403. The Governor has the statutory power to propose the State budget, *N.J.S.A.* 52:27B–20, and the right to exercise a selective veto over the appropriations. *N.J. Const.* art. V, § 1, ¶ 15.

The members of the Constitutional Convention of 1947 considered the Governor's "significant responsibilities over the State's fiscal affairs" to be an important aspect of the centralization of State finances essential to efficient modern government operations. *City of Camden v. Byrne, supra,* 82 *N.J.* at 150, 411 *A.*2d 462 (citing George C. Skillman & Sidney Goldmann, "The Single Budget, Single State Fund and Single Fiscal Year" (Monograph), II *Proceedings of the New Jersey Constitutional Convention of 1947* 1668 at 1683–84). Indeed, "a

prime objective of the 1947 Constitutional Convention was to create a strong executive," Williams, *N.J. State Constitution, supra,* at 79. The aim was to make the principal departments of government subject to gubernatorial supervision so as to form a streamlined, modern, and accountable executive branch. *Id.* at 90 (citing *Association of New Jersey State College Faculties, Inc. v. Board of Higher Educ.,* 112 *N.J.Super.* 237, 270 *A.*2d 744 (Law Div.1970)).

The New Jersey Constitution is unusual because it is the only state constitution under which the Governor is the only official elected on a statewide basis. "This pinpoints responsibility for executive branch operations in the Governor's Office and adds to his power." Williams, *N.J. State Constitution, supra,* at 91.

In *Kenny v. Byrne,* 144 *N.J.Super.* 243, 365 *A.*2d 211 (App. Div.1976), *aff'd,* 75 *N.J.* 458, 383 *A.*2d 428 (1978), executive-branch employees challenged an executive order that required high-echelon State employees to file financial disclosure statements with the Secretary of State. Those employees argued that such an order was beyond the Governor's authority. The Appellate Division disagreed and found the executive order well within the Governor's authority. In reaching its conclusion, the court relied on the Governor's constitutional power, as head of the executive branch, to take care that the laws be faithfully executed, and the 1947 Constitution's recognized objective to create a strong executive.

> To achieve this goal, the major principles of modern state administrative reorganization were incorporated into the 1947 Constitution:
>> "These principles—directed toward the achievement of maximum efficiency and economy in the execution of State administrative activities, are:
>> (1) integration of all administrative activities of the State along functional lines within a few well-balanced principal departments;
>> (2) establishment of direct lines of responsibility for the administration of such functions and activities—from the Governor, through the department heads, to the subordinate officers of each department;
>> (3) providing the Governor with executive authority commensurate with his responsibilities to the people of the State, * * *."
>
> [144 *N.J.Super.* at 251, 365 *A.*2d 211 (quoting Leon S. Milmed, *The New Jersey Constitution of 1947,* in *N.J.S.A. Const.* 91, 103–04).]

The court understood that "[u]nmistakably, the executive power reposed in the Governor under the Constitution * * * must be given life and meaning by investing him with the authority to implement his responsibilities. * * * To conclude otherwise is to negate the intent of the framers of the Constitution of 1947." *Kenny v. Byrne, supra,* 144 *N.J.Super.* at 251, 365 *A.*2d 211 (citations omitted). The Appellate Division also was influenced by the fact that the executive order did not encroach on the prerogatives of other branches of government, but in fact furthered the purpose of a related statute, the Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 to –27.

### III

■ We begin our analysis of the challenged legislative provisions by setting forth the well-established basic principles that must guide us. The Appropriations Amendment, like all legislative enactments, is presumed to be constitutionally valid. *See State v. Lagares,* 127 *N.J.* 20, 601 *A.*2d 698 (1992). The Legislature has the power to appropriate funds and to attach conditions or restrictions to appropriations. *Karcher v. Kean, supra,* 97 *N.J.* at 491–92, 479 *A.*2d 403. However, the Legislature's power to attach conditions to appropriations is limited by the doctrine of separation of powers, as well as by other constitutional provisions. The "primary responsibility for the conduct of the executive and administrative branches of government reside[s] in the Governor." *Russo v. Walsh,* 18 *N.J.* 205, 209, 113 *A.*2d 516 (1955). The Governor has direct and extensive control over the staffing and resources of each department of the executive branch. Those fundamental principles are firmly established in our constitutional law.

■ Separation-of-powers questions can arise when a branch delegates some of its own power away, *see Brown v. Heymann, supra,* 62 *N.J.* 1, 297 *A.*2d 572, or when a branch takes unto itself some of the powers of another branch, *see Enourato v. New Jersey Bldg. Auth., supra,* 90 *N.J.* 396, 448 *A.*2d 449;

*General Assembly v. Byrne, supra,* 90 *N.J.* 376, 448 *A.*2d 438. Although both the giving and taking of power can be constitutional if not excessive, the taking of power is more prone to abuse and therefore warrants an especially careful scrutiny. The case before us is one in which the Legislature has taken for itself a power normally lodged in the executive branch. Therefore, our deference to the Legislature must be accompanied by the most thorough and careful review to guard against the encroachment of one co-equal branch of government on another.

Our review begins with two opinions involving legislative veto power over the Governor's actions. Those two cases set forth the test to be applied in determining whether the Legislature has unconstitutionally intruded on the Governor's executive power.

In *General Assembly v. Byrne, supra,* 90 *N.J.* at 376, 448 *A.*2d 438, we considered the constitutionality of the Legislative Oversight Act, which allowed the Legislature "to veto by a concurrent resolution of both houses '[e]very rule hereafter proposed by a State agency,' with certain limited exceptions." *Id.* at 378, 448 *A.*2d 438. We held that the Legislative Oversight Act violated the separation-of-powers principle by "excessively interfering with the functions of the executive branch" and by "impeding the Executive in its constitutional mandate to faithfully execute the law." *Ibid.* Yet we maintained that not all legislative-veto provisions were necessarily a violation of the principle of separation of powers, and indeed we upheld such a provision in *Enourato v. New Jersey Building Authority, supra,* 90 *N.J.* 396, 448 *A.*2d 449, decided the same day as *General Assembly v. Byrne.*

The challenged statute in *Enourato* created the New Jersey Building Authority for the purpose of building and operating office space for State agencies. The statute provided that the Governor could veto all actions taken by the Authority. If the Governor approved the plan, then there were two forms of

legislative veto. First, the Authority was required to obtain a concurrent resolution in order to begin a project if its estimated cost would exceed $100,000. Second, the Act required that every lease agreement between the Authority and a State agency be approved by the presiding officer of each house of the Legislature. We held that those limited legislative veto provisions could be accommodated within the constitutional structure of separation of powers.

The crucial difference between the two legislative-veto provisions lay in the nature and scope of the infringement on the powers of the Executive. The same test was used to analyze both statutes.

Where legislative action is necessary to further a statutory scheme requiring cooperation between the two branches, and such action offers no substantial potential to interfere with exclusive executive functions or alter the statute's purposes, legislative veto power can pass constitutional muster. [*General Assembly v. Byrne*, 90 *N.J.* at 395, 448 *A.*2d 438, *quoted in Enourato v. New Jersey Bldg. Auth.*, 90 *N.J.* at 401, 448 *A.*2d 449.]

We found that the Legislative Oversight Act in *General Assembly v. Byrne* did not pass that test. Legislative oversight of agency rulemaking was not necessary to effectuate the statutory scheme underlying the rules. Moreover, the potential for interference with exclusive executive functions was high. The legislative-veto provision contained in the Legislative Oversight Act allowed the Legislature "to nullify virtually every existing and future scheme of regulation or any portion of it * * * 'without a change in the general standards the legislature has initially decreed.'" *General Assembly v. Byrne, supra,* 90 *N.J.* at 386, 448 *A.*2d 438 (quoting *Chadha v. Immigration and Naturalization Service,* 634 *F.*2d 408, 432 (9th Cir.1980), *aff'd Immigration and Naturalization Service v. Chadha,* 462 *U.S.* 919, 103 *S.Ct.* 2764, 77 *L.Ed.*2d 317 (1983)). That intrusion into the constitutionally-delegated authority of the Executive to enforce the laws was excessive under the existing constitutional scheme.

By contrast, in *Enourato,* we determined that due to the ongoing need for funding of Building Authority projects, the

statutory scheme did require cooperation between the two branches. We found that there was some limited potential for interference with exclusive executive functions, but that "the mere remote possibility of never-ending legislative vetoes is insufficient to invalidate a veto provision that serves an important governmental purpose." 90 *N.J.* at 407, 448 *A.*2d 449. Furthermore, the Executive retained significant control over the functions of the Authority, including a veto, and therefore the legislative veto would neither "substantially disrupt exclusively executive branch functions" nor "subvert the Governor's role in enforcing the law." *Id.* at 402–03, 448 *A.*2d 449. Hence, intrusion on the Executive area of control was limited.

Other examples of the limits of separation of powers and the limits of accommodation are presented by *Winberry v. Salisbury,* 5 *N.J.* 240, 74 *A.*2d 406, *cert. denied,* 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950), and *Knight v. Margate, supra,* 86 *N.J.* at 374, 431 *A.*2d 833. In *Winberry,* we considered a conflict between a court Rule and a statute dealing with the time within which a litigant may file an appeal. Rule-making authority was assigned to the Supreme Court in Article VI, Section 2, paragraph 3 of the 1947 Constitution, but that authority was given "subject to the law."

[I]n *Winberry,* the issue was whether "subject to law" allowed the Legislature to override all the rules of the Court, even those dealing with the Court's own rules and procedures. Chief Justice Vanderbilt held that complete power and responsibility in the Judiciary are concepts inconsistent with the notions of overriding legislation. He realized that if the Legislature could overrule the courts in some of their essential operations, the Judiciary "instead of being one of the three coordinate branches of State Government, would have been rendered subservient to the Legislature in a fashion never contemplated by any."

So the Vanderbilt Court interpreted the phrase "subject to law" to refer to laws "substantive in content" that define our rights and duties but not to refer to the Court's exclusive powers of rule-making with respect to practice and procedure, the administration of the courts, and the professional conduct of members of the bench and bar. [Marie L. Garibaldi, *The New Jersey Experience: Accommodating the Separation between the Legislature and the Judiciary,* 23 *Seton Hall L.Rev.* 3, 7 (1992).]

In *Knight v. Margate,* we upheld an amendment to the New Jersey Conflicts of Interest Law that prohibited members of the judiciary from participating in dealings with casinos. We found that because of the vital governmental interest in pervasive regulation of the gambling industry, and because the restrictions did not interfere with the judiciary branch's authority to administer the court system and to regulate the bar, the limited legislative intrusion into the area of judicial authority could be accommodated without offending the Constitution.

A crucial factor, however, in *Knight v. Margate* was that the legislative enactment did not purport to strip the judiciary branch of the ultimate authority to administer its functions.

> We do not believe that the restrictions imposed by the latest amendments will in any way interfere with the sound administration of the judicial system or undermine the proper regulation of the ethical conduct of members of the judiciary and the bar. Any possible doubts on this score dissipate in light of this Court's overriding constitutional authority to adopt and fashion its own regulatory and ethical requirements for the judicial branch and the practicing bar at any time it becomes appropriate to do so regardless of the Legislature's action.

[*Knight v. Margate, supra,* 86 *N.J.* at 394, 431 *A.*2d 833 (citations omitted).]

■ The principles that governed our separation-of-powers decisions in the cases discussed above are equally applicable to this case. Where cooperation between the branches is necessary to further the underlying substantive purposes of the legislative enactment, and where the cooperation offers no substantial potential for interference with the exclusive functions of the other branch, the mechanism for legislative involvement will not violate the separation-of-powers principle. But where shared authority is not necessary to effectuate the statutory scheme, or where the legislative intrusion threatens to interfere with exclusive functions of another branch, then the intrusion will violate the separation-of-powers principle.

■ The Legislature properly has the power to reduce appropriations for the operation of State government. Both the executive and legislative branches agree that because the Ap-

propriations Act did not provide sufficient funds to maintain staffing at then-current levels, personnel cuts were required. According to plaintiffs, the Legislature's purpose in enacting the provisions restricting layoffs was to ensure that those personnel cuts were made in the most efficient manner possible, with the least possible disruption in the provision of State services.

■ Legislative oversight of or cooperation with the Executive was not necessary to fulfill that purpose. The Governor had the ability—and indeed the duty—to make the necessary personnel cuts so as to enable the agencies to continue to function as efficiently and effectively as possible. Not only was the legislative mandate of how to make the cuts unnecessary for the effectuation of the statutory scheme, but the Legislature's attempt to "micromanage" the staffing and resource allocations in administering the appropriated funds was a serious intrusion on the Governor's authority and ability to perform his constitutionally-delegated functions.

Staffing decisions are at the core of the Governor's day-to-day administration of government. Decisions about what type of employees are needed in a department and how many positions can be retained or eliminated directly affect how the executive branch operates. By hampering executive discretion on staffing decisions, the provisions prevent the Governor and department heads from using their expertise and familiarity with the agencies they manage to make the cuts in the least disruptive manner. Thus the provisions impede them in the performance of their constitutional duties faithfully to execute the laws.

Plaintiffs point out that the Legislature could severely affect the day-to-day operation of executive agencies without running afoul of the Constitution by refusing to fund them. Although that is undoubtedly true, plaintiffs fail to recognize the distinction between the power to appropriate or not appropriate funds, a legislative function, and the power to expend the appropriated

funds, an executive function. *In re Karcher, supra,* 190 *N.J.Super.* at 213, 462 *A.*2d 1273 (quoting *Brown v. Honiss,* 74 *N.J.L.* 501, 521, 68 *A.* 150 (E. & A. 1906)). The Governor is duty-bound to use the resources given him by the Legislature to provide the most efficient government. To interfere with his ability to perform that duty is "to negate the intent of the framers of the Constitution of 1947" to form a strong, effective, and accountable executive branch. *Kenny v. Byrne, supra,* 144 *N.J.Super.* 243, 365 *A.*2d 211 (App.Div.1976).

Indisputably, the Legislature retains broad powers in the appropriations process to control the size and priorities of the State government. The Legislature properly exercised that power in this case by choosing to reduce the amount of money it appropriated to the salaries-and-wages accounts of most executive departments, thus necessitating a reduction of the State workforce through layoffs. The Legislature's power to shape State government and achieve savings in this manner is unquestioned. However, in this case the Legislature went one step further in its attempt to shape State government. Having reduced the salaries-and-wages accounts, it attempted, through the provisions challenged here, to control how those reduced appropriations would be administered by specifying which employees should and should not be laid off. Although the Legislature may "appropriate and dictate, if it desires, the services and positions designated for such appropriation," *New York Pub. Interest Research Group v. Carey,* 86 *Misc.*2d 329, 383 *N.Y.S.*2d 197, 200 (Sup.Ct.), *aff'd,* 55 *A.D.*2d 274, 390 *N.Y.S.*2d 236 (1976), " '[t]here is one thing * * * [the Legislature] cannot do * * *. It cannot exercise the functions of the executive. It cannot administer the money after it has been once appropriated.' " *Ibid.* (quoting *People v. Tremaine,* 252 *N.Y.* 27, 168 *N.E.* 817, 828 (1929) (Crane, J., concurring)).

The mandatory requirements of the Appropriations Amendment, unlike the provisions upheld in *Knight v. Margate,* purport to deny the Governor's overriding authority to administer the executive branch "regardless of the Legislature's action"

where he deems it necessary. Like the invalidated statute in *Winberry*, the Appropriations Amendments not only attempt to regulate the internal administration of a coordinate branch but also purport to override the authority of that coordinate branch to administer its own functions. The Legislature may at times *overlap* the authority of the Executive but it may never *override* the Executive's authority to manage its own affairs.

This is not a case, like *Enourato*, in which the Legislature had delegated power to an executive agency to commence long-lasting, costly projects that would require the ongoing cooperation of the Legislature in the form of annual appropriations. This case is more like *General Assembly v. Byrne*, in which the Legislature trusted its own judgment on how to implement the laws more than it trusted the judgment of the executive agencies to which the role of implementation was constitutionally assigned. Here, the Legislature evidently believed that it could implement personnel cuts more efficiently than the Governor could or would, and so it attempted to force the Governor to make personnel savings in the manner the Legislature thought best. The Governor ignored the legislative mandate in order to make cuts in the manner he found most efficient.

Our role is not to judge whose plan was better. That power and duty belongs ultimately to the people, who through their elected representatives and officials in both the legislative and executive branches can determine what kind of government they want. Our role and duty is to interpret the New Jersey Constitution and apply it to the situation before us. In so doing, we "attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case." *Dames & Moore v. Regan*, 453 *U.S.* 654, 661, 101 *S.Ct.* 2972, 2977, 69 *L.Ed.*2d 918, 928 (1981).

In the present case, the extent to which the legislation prevents the executive branch from accomplishing its constitutionally-assigned functions disrupts the balance between the

Legislature and the Executive. The Constitution commits the authority and the duty to run the executive branch to the Governor. For better or for worse, decisions on how to use the funds appropriated by the Legislature to staff executive agencies are for the Governor to make, and the Legislature may not dictate whom he may, or may not, lay off. Therefore, we hold that Section 1 of S. 996, the Appropriations Amendments Act, is void because it violates the separation-of-powers principle as embodied in the New Jersey Constitution, Article III, paragraph 1.

## IV

The original Appropriations Act contains some of the same constitutional infirmities as the Appropriations Amendment. Section 38 states, in part:

> 38. Notwithstanding the provisions of any law to the contrary, no State Troopers, corrections officers or personnel providing services in any institution operated by the State shall be laid off.

That language, like that contained in Senate Bill 996, impermissibly intrudes on executive authority by dictating staffing decisions and is therefore void.

The original Appropriations Act, prior to its amendment, also contained the following language in section 38:

> Whenever possible, layoffs shall exclude those employees of any department who provide direct services and shall also exclude career State employees who have occupied the same job title for at least five years or who have ten years of state service.

The amendment deleted that language and substituted the mandatory language that we find unconstitutional in Part III of this opinion. We must consider whether the portion of the amendment that deleted the discretionary language is severable from the portion of the amendment that inserted the mandatory language now held to be void in order to determine whether the amendment effectively repealed the original discretionary language.

The doctrine of severance of an unconstitutional portion of a statute is to be applied with caution and attention to the legislative intent. An unconstitutional amendment will not impair the pre-existing valid provision of an existing statute if the Legislature intends that the constitutional insufficiency of the amendment not render the pre-existing statute inoperative. *Washington Nat'l Ins. Co. v. Board of Review,* 1 *N.J.* 545, 556, 64 *A.*2d 443 (1949). "Whether such 'judicial surgery' should be utilized depends upon whether the Legislature would have wanted the statute to survive." *Chamber of Commerce v. State,* 89 *N.J.* 131, 151–52, 445 *A.*2d 353 (1982). Invalidating the insertion of the mandatory language in amended Section 38, while upholding the deletion of discretionary language in the existing Section 38, would thwart the Legislature's clear intent to offer some guidance to the Executive concerning the implementation of layoffs. We are confident that the Legislature would prefer to offer discretionary guidance to the Executive than to offer no guidance at all. We therefore conclude that the pre-existing Section 38 of the Appropriations Act was not impaired by the Amendment of Section 38. The legislative intent is best fulfilled by restoring the original language of Section 38. *See State v. Lagares, supra,* 127 *N.J.* at 32, 601 *A.*2d 698.

The "whenever possible" language of the original language leaves room for the Executive's exercise of judgment. The Governor retains the "overriding constitutional authority to adopt and fashion" his own lay-off plan "regardless of the Legislature's action" if he determines that it is "appropriate to do so." *Knight v. Margate, supra,* 86 *N.J.* at 394, 431 *A.*2d 833. The original Section 38 therefore represents less of an interference with executive authority than the mandatory provisions of the amended Section 38. Because the ultimate authority to manage executive affairs remains with the executive branch, the discretionary guidance contained in the original Section 38 can be accommodated within our constitutional scheme of separation of powers.

Most departmental appropriations in the Appropriations Act contain a paragraph stating that a program could augment its salary account by transferring to it a specified sum "from the other appropriations made for Salaries and wages in the department to reflect savings throughout the department from the reduction of employees whose annual salaries exceed $50,000." *See supra* at 444, 617 *A*.2d at 225 for the specific statutory language.

 If that restriction on the use of salary accounts were interpreted as mandatory, overriding the authority of the executive branch to implement layoffs according to its own discretion, then it would be void. However, both the Governor and plaintiffs agree that this language should be interpreted as discretionary. To avoid a reading that would invalidate the statute, we accept the parties' interpretation of the language. *State Farm Mut. Automobile Ins. Co. v. State*, 124 *N.J.* 32, 61, 590 *A*.2d 191 (1991) ("[E]ven were this construction doubtful, we would accept it in order to avoid an interpretation of the statute that would render it unconstitutional."). Such discretionary guidance from the Legislature does not excessively interfere with the constitutionally-assigned authority of the Executive and can be accommodated within the structure of separated powers.

 Likewise, we find that the requirement in the Appropriations Act that each Commissioner provide the Director of the Division of Budget and Accounting and the Joint Budget Oversight Committee with written notice and justification of any reductions in the classified service does not impermissibly encroach on the executive branch's power. Although the provision interferes with the Executive's authority to staff the executive departments of government, it does not give the Legislature veto power over the Executive's authority to discharge any employees. Hence, it does not "substantially disrupt exclusive executive branch functions." *Enourato v. New Jersey Bldg Auth., supra*, 90 *N.J.* at 401, 448 *A*.2d 449.

## V

In resolving this case, we emphasize that this Court is most reluctant to interfere in a separation-of-powers dispute between the other branches of government. Such disputes are best resolved by the other branches reaching an accommodation of their respective powers. However, we cannot decline to hear a properly brought case that raises the substantial constitutional issues of whether the acts of one branch of government impermissibly encroach on another branch's power so as to violate the separation-of-powers clause of the New Jersey Constitution. *N.J. Const.* art. VI, § 2, ¶ 2 & § 5, ¶ 1. Our opinion is, therefore, limited solely to the issues presented in plaintiffs' complaints and amended notice of appeal.

In Justice Powell's concurrence in *Chadha v. INS, supra,* he noted that the "boundaries between each branch should be fixed 'according to common sense and the inherent necessities of the governmental coordination.'" 462 *U.S.* at 962, 103 *S.Ct.* at 2790, 77 *L.Ed.*2d at 352 (quoting *J.W. Hampton v. United States,* 276 *U.S.* 394, 406, 48 *S.Ct.* 348, 351, 72 *L.Ed.* 624, 629 (1928)). Applying the *General Assembly/Enourato* test in a realistic and practical manner, we find that the layoff provisions in the 1993 Appropriations Act violate the separation-of-powers doctrine: they are not necessary to further a statutory scheme that requires cooperation between the legislative and executive branches, nor do they merely interfere indirectly or incidentally with exclusive executive functions. Rather, they effectively strip the executive branch of its authority properly to administer its constitutionally-imposed functions.

Accordingly, we conclude that Section 1 of the Appropriations Amendments, Senate Bill 996, *L.*1992, *c.* 99, is unconstitutional. Section 38 of the 1993 Appropriations Act, Senate Bill 1000, *L.*1992, *c.* 40, is also unconstitutional insofar as it purports to dictate to the Executive whom he may and may not lay off. However, the discretionary guidance provisions of the Appro-

priations Act do not offend the separation-of-powers principle and are therefore constitutional.

*For the judgment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.